[No. S073756. Dec. 3, 1998.]

IN RE ATTORNEY DISCIPLINE SYSTEM; REQUESTS OF THE
GOVERNOR AND THE STATE BAR OF CALIFORNIA.

## COUNSEL

Marie M. Moffat, Lawrence C. Yee, McCutchen, Doyle, Brown & Enersen and Raymond C. Marshall for the State Bar of California.

Daniel M. Kolkey, L. Michael Bogert and Brian W. Jones for Governor Pete Wilson.

Daniel E. Lungren, Attorney General, Anthony S. Da Vigo, Deputy Attorney General, Philip S. Anderson, Diane L. Karpman, Stephen R. Barnett, Anthony J. Bradisse, J. Anthony Vittal, John T. Philipsborn, William M. Wunderlich, David Cameron Carr, Anthony T. Caso, Sharon L. Browne, R. S. Radford, James R. Christiansen, Colin J. Devellerez, Jerome M. Garchik, Michele Louise Giguiere, David J. Halperin, Bradford E. Henschel, Fred J. Hiestand, Ross Johnson, Betsey Warren Lebbos, Levin, Ephraim Margolin, Patrick J. McDonough, Melanie L. Morgan, James W. O'Brien, Michael J. Oths, William Nesh, Sharon L. Browne, Deborah J. La Fetra, Lise A. Pearlman, Ellen R. Peck, Murray B. Petersen, Nancy G. Priddis, Emory L. King, Jr., James V. de la Vergne, Adam B. Schiff, Ronald R. Silverton, John Cary Sims, Jimmy Starr, James N. Waldorf, Larry Gassner, Anderlini, Finkelstein & Emerick, P. Terry Anderlini, Kopp and Di Franco, Quentin L. Kopp, Cotter & Del Carlo, Richard A. Canatella, Ronald M. Toran, Rawles, Hinkle, Carter, Behnke & Oglesby, Jared G. Carter, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Jerome B. Falk, Jr., Therese M. Stewart, Horvitz & Levy, Ellis J. Horvitz, Jon B. Eisenberg, Kehr, Crook & Fox, Robert L. Kehr, Cooper, White & Cooper, Mark L. Tuft, Townsend and Townsend and Crew, Paul W. Vapnek, Hardy, Erich, Brown & Wilson and David S. Worthington as Amici Curiae.

## OPINION

**GEORGE, C. J.**—On October 14, 1998, this court issued an order soliciting public comment in response to a letter submitted to the court by Governor Pete Wilson and a "Request for a Special Regulatory Assessment" submitted by the State Bar of California.

In his letter, the Governor acknowledged that a problem with public protection had arisen because the State Bar's disciplinary system no longer was operating effectively, observed that "[c]learly, the Court has inherent power over the discipline of attorneys," and requested that this court assume responsibility over the attorney discipline system pending a legislative solution. At the same time, however, the Governor asserted that this court's imposition of additional fees on members of the State Bar would invade the legislative prerogative, and argued that "[t]he Court could direct that at least a portion of the existing Bar membership fees be used to fund a discipline system that ferrets out the most egregious offenders."

In its request, the State Bar asked that the court issue an order requiring active members of the State Bar to pay a fee of $171.44 in addition to $77 already authorized by existing statutes, for the purpose of funding the bar's disciplinary activities. The State Bar asserted that the court had the power to assess this fee under its inherent authority to regulate the admission and discipline of attorneys practicing in the state.

Citing the circumstance that "the legislative session has adjourned without the enactment of a measure to provide for the usual funding of the attorney disciplinary process in California and that there may be a substantial risk to the public resulting from the absence of an adequately functioning attorney disciplinary system," the court set a hearing on the requests submitted by the Governor and the State Bar for November 9, 1998, at its courtroom in Sacramento. In addition, the court solicited comments and briefs presenting legal analysis and supporting points and authorities on three specific questions,[1] and invited interested individuals and organizations to submit requests to address the court. More than 50 written submissions were filed

---

[1]The court posed the following three questions in its order:

"1. What authority does the Supreme Court of California have to impose a fee requirement on licensed attorneys for the limited purpose of funding an attorney disciplinary system? What weight should be given to the numerous out-of-state decisions cited in the State Bar's request (and its earlier submission on June 22, 1998) that have upheld the authority of a state supreme court to impose a license fee on attorneys for such purpose, and what other authority should the court consider?

"2. If the Supreme Court has authority to impose such a fee upon attorneys to fund an attorney disciplinary system, should the court exercise such authority at this time; if so, in what manner and in what amount should a fee be set?

"3. Are there available alternatives to the imposition of a license fee on attorneys for disciplinary purposes that would provide adequate protection of the public, and, if so, what are they? Given that the use of $50 of the $77 fee presently imposed on attorneys by statute is restricted to the Client Security Fund and the Building Fund (see Bus. & Prof. Code, §§ 6140.3, subd. (a)[,] 6140.55 [further undesignated statutory references are to this code]), leaving only $27 for disciplinary purposes, are there other funds available for these purposes?"

with the court, which granted the requests of 15 individuals to make an oral presentation at the hearing.[2]

For the reasons explained below, we conclude that this court has authority to impose a regulatory fee upon attorneys for the purpose of supporting an attorney discipline system, and that it is incumbent upon this court to do so at this time, because the lack of a functioning attorney disciplinary system places at grave risk the public, the integrity of the legal profession, and the interests of the courts. The Legislature adjourned in September 1998 without authorizing an annual State Bar membership fee for either 1998 or 1999, leaving the State Bar with only a skeletal discipline system incapable of providing adequate public protection. The backlog of complaints is mounting, and the adverse effects of a nonfunctioning attorney disciplinary system are becoming more and more evident. Although the newly elected Legislature will be convening in December 1998 for organizational purposes, and Governor-elect Gray Davis will assume office early in January 1999, there are no assurances that a legislative solution to the impasse in Sacramento will be found in the near future, or, even if found, will become effective before January 1, 2000.

Furthermore, we conclude that this court has the authority to provide that the funds generated by its imposition of a regulatory fee on attorneys be used, under the supervision of a special master appointed by this court, to support the existing State Bar attorney discipline system. Such an approach represents the least intrusive means of providing protection for the public pending a legislative resolution of the outstanding issues regarding the bar's functions, and best preserves the status quo until agreement can be reached. As we shall explain, this court's actions in this regard do not violate the separation of powers doctrine, but rather reflect our inherent and primary constitutional authority in the area of attorney discipline, and the well-established role of the State Bar as an administrative arm of this court with regard to attorney discipline.

---

[2]The following individuals addressed the court: Daniel M. Kolkey, Esq., Legal Affairs Secretary, on behalf of Governor Pete Wilson; Raymond C. Marshall, President of the State Bar of California, and Lawrence C. Yee, Chief Assistant General Counsel, for the State Bar of California; Senator Quentin L. Kopp; Professor Stephen R. Barnett, Boalt Hall School of Law; Jerome B. Falk, Jr., Esq., on behalf of numerous local and specialty bar associations; J. Anthony Vittal, Esq., President, California Association of Local Bars; James V. de la Vergne, Esq., Chair, Client-Attorney Relations Committee, Sacramento County Bar Association; Anthony T. Caso, Esq., Pacific Legal Foundation, on behalf of Raymond Brosterhous; Presiding Judge James W. O'Brien, State Bar Court; Lise A. Pearlman, Esq., former Presiding Judge, State Bar Court; Michael J. Oths, Esq., President, National Organization of Bar Counsel; Mark L. Tuft, Esq., former Chair, State Bar Committee on Professional Responsibility and Conduct; John T. Philipsborn, Esq., Chair, Amicus Curiae Committee, California Attorneys for Criminal Justice; Professor John Cary Sims, McGeorge School of Law.

Accordingly, upon the filing of this opinion, we adopt a rule imposing a special regulatory assessment on attorneys actively engaged in the practice of law, to be used exclusively for attorney disciplinary purposes. Concurrently, we shall appoint a special master charged with oversight of the funds collected pursuant to the rule, in order to ensure that they are utilized by the State Bar solely to fund disciplinary functions.

In taking this action, we are mindful of the Legislature's traditional role in setting dues for members of the State Bar, as well as this court's ultimate and inherent authority over and responsibility for the discipline of attorneys licensed to practice before the courts of California. We emphasize that the rule we adopt is interim in nature, narrow in scope, and directed solely at providing necessary disciplinary functions. Our intention is to provide protection to the public, the courts, and the legal profession pending further action by our sister branches. At such time as the legislative and executive branches authorize funding for an adequately functioning attorney discipline system, we shall resume this court's traditional role in this area.

I

The State Bar of California was created by the State Bar Act of 1927. (§ 6000 et seq.) In 1966, the electorate adopted a provision placing the State Bar in the *judicial article* of the state Constitution. Article VI, section 9 of the California Constitution states: "The State Bar of California is a public corporation. Every person admitted and licensed to practice law in this State is and shall be a member of the State Bar except while holding office as a judge of a court of record."[3] Traditionally, the functions of the bar have been funded through fee assessments imposed by the Legislature.

On October 11, 1997, Governor Wilson vetoed Senate Bill No. 1145 (1997-1998 Reg. Sess.), which would have authorized the State Bar to collect a total of $458 per year from each attorney in 1998 and 1999.[4] After the Governor's veto, the bar remained authorized by statute to collect $77 in annual bar dues in 1998, of which $40 expressly is reserved for the Client Security Fund and the costs of its administration (§ 6140.55), and $10

---

[3]The unique role of the State Bar is further illustrated by article VI, section 6 of the California Constitution, which describes the membership of the Judicial Council, and by the former version of section 8, subdivision (a), which described the composition of the Commission on Judicial Performance until the commission's structure was revised, effective in 1995, by Proposition 190. These provisions gave the State Bar of California express authority—along with the Supreme Court or the Chief Justice, the houses of the Legislature, and the Governor—to appoint a specified number of members of each respective body.

[4]Attorneys in practice for fewer than three years would have been assessed a lower fee, consistent with previous practice. (See former § 6140.)

expressly is reserved for costs relating to providing facilities for staff or major capital improvement projects (§ 6140.3). The remaining $27 may be used for the costs of the disciplinary system. (§§ 6140.6, 6140.9.)

Negotiations among the bar, the Governor, legislators, and other interested individuals and entities ensued over the next several months. On June 22, 1998, the State Bar filed with this court a "Letter Requesting Rule Of Court Or Order Setting Annual State Bar Membership Fee To Provide Emergency Interim Funding." The letter stated that lack of available funding due to the absence of a dues bill would result in the layoff of approximately 500 State Bar employees on June 26, 1998. The letter requested that the court issue a rule or order setting the active membership fee at $287, to be paid by all active members of the State Bar, in order to permit the State Bar to perform its mandated disciplinary and regulatory functions and services, pending further action by the Legislature.

The court considered the request and entered the following order: "The court recognizes the importance of the core functions relating to the admission and discipline of attorneys carried out by the State Bar and encourages the other two branches of government and the State Bar to resolve this matter as quickly as possible in light of the interest of the public and the potential impact on the operations of the court of the Bar's inability to carry out its disciplinary functions. In view of the importance of the issue and the apparent impasse among the various interested parties, the court has requested that the Chief Justice make himself available, upon the request of the parties, to offer assistance in the resolution of this matter. The request that this court issue an order or adopt a rule requiring payment of membership fees by active members of the State Bar of California is denied." The projected layoffs of employees became effective on June 26, 1998.

With the exception of the State Bar, the parties did not request the assistance of the Chief Justice proffered by the court, and the Legislature adjourned without having enacted a fee bill for either 1998 or 1999. In order to adopt a bill that will require attorneys to pay fees in 1999 beyond the already authorized $77, the newly reconvened Legislature will be required to act by a two-thirds majority vote. If a fee bill is enacted by a simple majority vote, it will not be effective until January 1, 2000. (Cal. Const., art. IV, § 8, subds. (c), (d).)

We consider the Governor's and the State Bar's pending requests in light of these circumstances.

II

The State Bar requests that this court impose a special fee assessment upon all active members of the bar, to be used to fund the State Bar's

existing disciplinary system, pursuant to our inherent power to regulate the legal profession. The Governor acknowledges that this court "may create a new disciplinary system in accordance with its inherent powers" and requests that we do so, but contends that "funding a legislatively crafted organization [like the State Bar] . . . beyond its statutorily authorized amounts" would violate the constitutional separation of powers and circumvent the legislative process. In other words, the Governor maintains that this court may create a disciplinary scheme separate from the State Bar, but that we may not assess a fee upon attorneys to fund the existing disciplinary structure within the State Bar.

■■■■■ In evaluating the respective positions of the State Bar and the Governor, we shall examine the following matters: (1) our inherent authority over attorney discipline; (2) whether that authority extends to imposing fees upon attorneys to fund a disciplinary system; (3) if so, whether a decision by this court to fund the State Bar's disciplinary system would violate the separation of powers doctrine; and (4) if we constitutionally may assess fees for this purpose, whether we should do so at this time.[5]

A. *This Court's Inherent Power Over Attorney Discipline*

■ Our inherent authority over the discipline of licensed attorneys in this state is well established. Article VI, section 1 of the California Constitution vests the judicial power in the Supreme Court, Courts of Appeal, superior courts, and municipal courts. "Since the 'courts are set up by the Constitution without any special limitations' on their power, they 'have . . . all the inherent and implied powers necessary to properly and effectively function as a separate department in the scheme of our state government. [Citations.]' [Citations.] [¶] In California, the power to regulate the practice of law, including the power to admit and to discipline attorneys, has long been recognized to be among the inherent powers of the article VI courts. Indeed, every state in the United States recognizes that the power to admit and to discipline attorneys rests in the judiciary. [Citation.] 'This is necessarily so. An attorney is an officer of the court and whether a person shall be admitted [or disciplined] is a judicial, and not a legislative, question.' [Citations.]" (*Hustedt* v. *Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 336-337 [178 Cal.Rptr. 801, 636 P.2d 1139], fns. omitted.) "This principle,

---

[5]At the outset, we reject as meritless the assertion by some that the members of this court are not impartial in this matter, and that the proceeding should be transferred to the Court of Appeal, simply because this court appoints the judges of the State Bar Court. We previously have rejected a similar assertion. (See *Lebbos* v. *State Bar* (1991) 53 Cal.3d 37, 41, fn. 1 [278 Cal.Rptr. 845, 806 P.2d 317].) Our appointment of the judges of the State Bar Court never has been viewed as precluding this court from impartially reviewing those judges' decisions; a fortiori, such appointment creates no conflict of interest in the present matter.

which was first recognized in California in 1850 [citation], has been reaffirmed on numerous occasions. [Citations.]" (*Id.* at p. 336, fn. 5; see also *In re Shannon* (1994) 179 Ariz. 52 [876 P.2d 548, 571] ["The judiciary's authority to regulate and control the practice of law is universally accepted and dates back to the year 1292."]; Martineau, *The Supreme Court and State Regulation of the Legal Profession* (1980-1981) 8 Hastings Const.L.Q. 199, 202 ["In each state it is the supreme court, with or without the legislative approval, that dictates the standards for education, admission and discipline of attorneys." (Fn. omitted.)].)[6] Our more recent decisions have continued to recognize this power. (E.g., *Santa Clara County Counsel Attys. Assn.* v. *Woodside* (1994) 7 Cal.4th 525, 542-544 [28 Cal.Rptr.2d 617, 869 P.2d 1142]; *Howard* v. *Babcock* (1993) 6 Cal.4th 409, 418 [25 Cal.Rptr.2d 80, 863 P.2d 150, 28 A.L.R.5th 811].)

Witkin has described our authority in this area as follows: "The important difference between regulation of the legal profession and regulation of other professions is this: Admission to the bar is a *judicial function*, and members of the bar are *officers of the court*, subject to discipline by the court. Hence, under the constitutional doctrine of separation of powers, the court has inherent and *primary regulatory power*. [Citations.]" (1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 356, p. 438, original italics.)

 Generally, those opposing the State Bar's request for a special fee assessment do not contest our inherent regulatory authority over the discipline of attorneys. Indeed, as we have shown, there are no substantial grounds on which to assert such a claim. Some of them, however, do argue that this authority does not encompass funding a disciplinary system through the imposition of membership fees upon licensed attorneys. We next consider that argument.

B. *This Court's Authority to Impose Fees to Fund an Attorney Disciplinary System*

Until now, we have had no occasion to consider whether our inherent authority over the discipline of attorneys includes the power to impose fees upon licensed attorneys to fund a disciplinary system. In *Carpenter* v. *The*

---

[6]The North Carolina Supreme Court appears to have recognized a partial exception to this general rule. In a closely divided decision, it held that establishing qualifications for admission to the practice of law is exclusively a legislative function. (*In re Applicants for License* (N.C. 1906) 55 S.E. 635, 636-637; see also *In re Smith* (1981) 301 N.C. 621 [272 S.E.2d 834, 840] [reiterating this principle].) That court also has held, however, that it retains inherent judicial authority to disbar attorneys, notwithstanding a separate legislative scheme for attorney discipline. (*In re West* (N.C. 1937) 193 S.E. 134, 135; *Brummitt* v. *Winburn* (N.C. 1934) 175 S.E. 498, 500.)

*State Bar* (1931) 211 Cal. 358, 360 [295 P. 23], however, we upheld the imposition of fees or dues to enforce the State Bar Act, recognizing that licensed attorneys properly may be required to pay the reasonable expenses of a disciplinary system. We subsequently reiterated this conclusion: "[I]t has been held that the reasonable expenses necessary to pay the costs of enforcement of the act, in furtherance of the purposes thereof, may be imposed upon the membership in the form of fees or dues." (*Herron v. State Bar* (1944) 24 Cal.2d 53, 64 [147 P.2d 543].)

Sister-state courts considering the question *uniformly* have concluded that the inherent power of the judiciary to regulate the practice of law includes the authority to impose fees necessary to carry out the court's responsibilities in this area. (E.g., *Petition of Florida State Bar Ass'n* (Fla. 1949) 40 So.2d 902, 906 ["If the judiciary has inherent power to regulate the bar, it follows that as an incident to regulation it may impose a membership fee for that purpose."]; *In re Integration of Bar of Hawaii* (1967) 50 Hawaii 107 [432 P.2d 887, 888] [The court has the inherent power to require attorneys to pay reasonable membership fees to fund a compulsory bar association.]; *Ex parte Auditor of Public Accounts* (Ky. 1980) 609 S.W.2d 682, 686 [Bar dues properly are imposed pursuant to the court's constitutional authority to administer the bar.]; *Board of Overseers of Bar v. Lee* (Me. 1980) 422 A.2d 998, 1003 [Although the police power generally is considered to be vested in the legislative department, it may on occasion be exercised by the courts, and the promulgation of a court rule imposing fees to fund an attorney disciplinary board is such an occasion.]; *Application of President of Montana Bar Ass'n* (1974) 163 Mont. 523 [518 P.2d 32, 33-34] [The court may impose fees pursuant to its power to regulate the practice of law.]; *In re Unification of New Hampshire Bar* (1968) 109 N.H. 260 [248 A.2d 709, 713-714] ["Because the legal profession by its very nature comes under the supervision of the judiciary, we do not feel that if a court, on a balance of interests, finds it in the public welfare to provide that lawyers . . . must be members of a unified bar and pay reasonable dues for its support, this would constitute a nefarious guild."]; *Calhoun v. Supreme Court of Ohio* (1978) 61 Ohio App.2d 1 [15 Ohio Op.3d 13, 399 N.E.2d 559, 565] ["[T]he . . . power of a court over matters relating to the practice of law, inclusive of . . . disciplinary actions . . . , includes, by reasonable necessity, the authority . . . to impose a membership fee for the support of such related activities."]; *Ford v. Board of Tax-roll Corrections* (Okla. 1967) 431 P.2d 423, 431 [The court's imposition of dues or fees to fund a state bar is an exercise of the police power vested in the court.]; *Petition of Tennessee Bar Ass'n* (Tenn. 1975) 532 S.W.2d 224, 229 [The court has inherent authority to require annual registration and license fees as a condition of the continued practice of law.]; *Banales v. Jackson* (Tex.Civ.App. 1980) 601 S.W.2d 508, 510-512

[The Supreme Court's inherent authority over the regulation of the practice of law includes the power to assess fees.]; *Matter of Washington State Bar Association* (1976) 86 Wn.2d 624 [548 P.2d 310, 314] ["Annual dues are collected under the authority of this court, and the existence of a separate statute authorizing the bar to collect the fees does not diminish this court's basic authority to authorize the collection of such dues."]; *In re Integration of the Bar* (1946) 249 Wis. 523 [25 N.W.2d 500, 501-502], overruled on another point by *In re Integration of the Bar* (1958) 5 Wis.2d 618 [93 N.W.2d 601, 605] ["[F]ees are the life blood of the integrated bar," and the court's "inherent power to control and regulate its bar . . . may be implemented by dues from the members . . . ."].)

Some opponents of the State Bar's request maintain that we have no available means to assess additional fees, because such an assessment would be in the nature of a tax or appropriation and the California Constitution's separation of powers provision (art. III, § 3)[7] reserves to the Legislature the power to levy taxes and appropriate funds. ▪ We agree, of course, that "the power to collect and appropriate the revenue of the State is one peculiarly within the discretion of the Legislature." (*Myers* v. *English* (1858) 9 Cal. 341, 349; see also *Butt* v. *State of California* (1992) 4 Cal.4th 668, 698 [15 Cal.Rptr.2d 480, 842 P.2d 1240] ["It has long been clear that . . . separation-of-powers principles limit judicial authority over appropriations."]; *City of Sacramento* v. *California State Legislature* (1986) 187 Cal.App.3d 393, 399 [231 Cal.Rptr. 686] ["A ruling that orders the Legislature to enact an appropriation necessarily implicates the independence and integrity of the Legislature and its ability to fulfill its mission in checking its coequal branches."].)

▪ Bar membership fees used to fund attorney discipline are not taxes or appropriations, however. ▪ "' "[F]ees charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes" ' " are regulatory fees, not taxes. (*Sinclair Paint Co.* v. *State Bd. of Equalization* (1997) 15 Cal.4th 866, 876 [64 Cal.Rptr.2d 447, 937 P.2d 1350].) ▪ The State Bar's "principal funding comes, *not from appropriations made to it by the legislature*, but from dues levied on its members . . . ." (*Keller* v. *State Bar of California* (1990) 496 U.S. 1, 11 [110 S.Ct. 2228, 2234, 110 L.Ed.2d 1], italics added.)

Our assessment of such regulatory fees would not invade the legislative prerogative. ▪ Although article III, section 3 of the California Constitution "defines a system of government in which the powers of the three

---

[7]Article III, section 3 of the California Constitution states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

branches are to be kept largely separate, it also comprehends the existence of common boundaries between the legislative, judicial, and executive zones of power thus created. [Citation.] Its mandate is 'to protect any one branch against the overreaching of any other branch. [Citations.]' [Citations.]" (*Hustedt* v. *Workers' Comp. Appeals Bd.*, *supra*, 30 Cal.3d 329, 338.)

"As this court explained nearly a half century ago: 'The courts have long recognized that [the] primary purpose [of the separation-of-powers doctrine] is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government. [Citations.] *The doctrine has not been interpreted as requiring the rigid classification of all the incidental activities of government, with the result that once a technique or method of procedure is associated with a particular branch of the government, it can never be used thereafter by another. . . .*' (Italics added.) [Citation.] Indeed, as a leading commentator on the separation-of-powers doctrine has noted: 'From the beginning, each branch has exercised all three kinds of powers.' [Citation.] [¶] It is commonplace to observe that both executive and judicial officials routinely exercise quasi-legislative authority in establishing general policies and promulgating general rules for the governing of affairs within their respective spheres. [Citation.] The exercise of such quasi-legislative authority, even when the policy decision that is made by the executive or judicial entity or official is one that could have been made by the Legislature, has never been thought to violate the separation-of-powers doctrine. [Citations.]" (*Davis* v. *Municipal Court* (1988) 46 Cal.3d 64, 76-77 [249 Cal.Rptr. 300, 757 P.2d 11].)

■ Therefore, the circumstance that the policy determination regarding the amount of membership fees necessary to fund a disciplinary system is one that properly could be made by the Legislature would not alone render our own assessment of such fees unconstitutional under the separation of powers doctrine. Out-of-state decisions are in accord. (*Petition of Florida State Bar Ass'n, supra*, 40 So.2d 902, 906-907 [Bar association membership fee is an exaction for regulation only, and is not a tax within the exclusive power of the legislature.]; *Board of Overseers of Bar* v. *Lee, supra*, 422 A.2d 998, 1004 [A state bar rule imposing fees "is not a bill for imposing a tax or for raising a revenue. It imposes upon attorneys a registration fee . . . . [¶] . . . When the exactions . . . are imposed in the exercise of a police power and as part of a program for the regulation of a particular business, occupation or profession, the levies are license fees and not taxes."]; *Sharood* v. *Hatfield* (1973) 296 Minn. 416 [210 N.W.2d 275, 277] [Money raised from "registration of attorneys to regulate the practice of law . . . is not tax money. It is held in trust by the supreme court for the purposes for which it has been contributed by attorneys."]; *Washington State Bar Ass'n* v. *State*

(1995) 125 Wn.2d 901 [890 P.2d 1047, 1050] ["It is important to keep in mind . . . that the Bar Association does not receive any appropriation from the Legislature or any other public body. It is funded entirely by mandatory membership licensing fees and various user fees . . . ."].)

Moreover, we previously have authorized the State Bar to assess various regulatory fees related to the practice of law, in the absence of any statute expressly permitting the imposition of such fees. (E.g., Cal. Rules of Court, rules 983(c) [applicants for permission to appear as counsel *pro hac vice* must pay a reasonable fee not exceeding $50 to the State Bar], 983.2(f) [the State Bar has the authority to set and collect appropriate fees and penalties for the certified law student program], 983.5(e) [the State Bar has the authority to set and collect appropriate fees and penalties for certifying legal specialists], 988(f) [the State Bar has the authority to set and collect appropriate fees and penalties for registering foreign legal consultants].) To our knowledge, this court's power to authorize the bar to impose and collect such fees has not been challenged on constitutional or other grounds.

License fees imposed by this court to fund an attorney disciplinary system would be imposed solely upon licensed attorneys, would not be imposed for general revenue purposes, would not become part of the state's General Fund, and would not be appropriated by the Legislature. Instead, they would be charged in connection with regulatory activities that do not exceed the reasonable cost of disciplining attorneys. Therefore, the imposition of such fees would not invade the Legislature's exclusive power over taxation and appropriation.[8] We agree with the unanimous view of the other state courts that have considered the issue that our inherent authority over the practice of law, including the discipline of attorneys, encompasses the power to assess membership fees to fund an attorney disciplinary system. The question whether this power includes the authority to impose fees to fund the existing *State Bar* disciplinary system is addressed below.

C. *This Court's Authority to Impose Fees to Fund the State Bar's Existing Disciplinary System*

The Governor and others contend that, despite our inherent authority over attorney discipline, we have no power to fund the existing disciplinary

[8]Nor does the imposition of a membership fee constitute the entry of a money judgment against an attorney, requiring individual notice and a hearing. As observed previously, we have held that attorneys constitutionally may be required to pay membership fees to fund the State Bar (*Carpenter* v. *The State Bar*, *supra*, 211 Cal. 358, 360), and individual notices and hearings never have been required since passage of the State Bar Act more than 70 years ago. The identity of the particular regulatory entity that is assessing otherwise valid fees does not alter their nature or require heightened procedural protections.

system within the structure of the State Bar, which was legislatively created and has been funded since its inception pursuant to legislative enactments regarding the amount of bar membership fees. They observe that the integrated bars of other states in which courts have assessed membership fees are subject to much less legislative control than California's State Bar, and they therefore contend that the out-of-state decisions cited above offer little, if any, support for the State Bar's position. We begin the analysis of this contention with a review of the historical background of the State Bar and the provisions regarding its status and relationship to this court, including our authority over its disciplinary functions.

■ As explained previously, the State Bar originally was designated a public corporation by statute. (§ 6001.) In 1960, however, the electorate amended article VI of the California Constitution—the article in the California Constitution that concerns the judicial branch—to declare the State Bar a constitutional body. Article VI, section 9, states: "The State Bar of California is a public corporation. Every person admitted and licensed to practice law in this State is and shall be a member of the State Bar except while holding office as a judge of a court of record." This amendment was part of a revision of article VI that, among other things, designated the membership of the Commission on Judicial Qualifications (presently known as the Commission on Judicial Performance) and the Judicial Council. The ballot argument in favor of the proposed constitutional amendment stated: "Inasmuch as the measure provides that the State Bar shall appoint the four lawyer members of the Judicial Council and the two lawyer members of the Commission on Judicial Qualifications, both of which are created by the State Constitution, it is thought advisable to include a provision giving the State Bar, which is now a statutory entity, the status of a constitutional body too. The Legislature, however, will continue to have power to regulate the administration of the State Bar by statute as it now does." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 8, 1960), argument in favor of Sen. Const. Amend. No. 14, p. 15; see 1 Witkin, Cal. Procedure, *supra*, Attorneys, § 358, p. 442 [The 1960 amendment to the California Constitution gave the State Bar constitutional status.].)

In adopting the State Bar Act, the Legislature expressly recognized that this court retained all disciplinary authority the court had prior to the passage of the act. Thus, section 6087 provides in part: "Nothing in this chapter shall be construed as limiting or altering the powers of the Supreme Court of this State to disbar or discipline members of the bar as this power existed prior to the enactment of [the State Bar Act]." In 1988, the Legislature added the following paragraph to section 6087: "Notwithstanding any other provision

of law, the Supreme Court may by rule authorize the State Bar to take any action otherwise reserved to the Supreme Court in any matter arising under this chapter or initiated by the Supreme Court; provided, that any action by the State Bar shall be reviewable by the Supreme Court pursuant to such rules as the Supreme Court may prescribe."

The State Bar Act contains other provisions confirming the reservation of our inherent authority over the practice of law. Thus, section 6075 provides: "In their relation to the provisions of [the State Bar Act], concerning the disciplinary authority of the courts, the provisions of this article provide a complete *alternative and cumulative* method of hearing and determining accusations against members of the State Bar." (Italics added; see *Emslie* v. *State Bar* (1974) 11 Cal.3d 210, 224 [113 Cal.Rptr. 175, 520 P.2d 991] [State Bar's assistance in matters of admission and discipline of attorneys is a method that is alternative and cumulative to the inherent power of this court in such matters.].) Similarly, section 6100 provides in part: "Nothing in this article limits the inherent power of the Supreme Court to discipline, including to summarily disbar, any attorney." In addition, section 6076 conditions the State Bar's formulation and enforcement of rules of professional conduct upon the approval of this court.

The Legislature also made clear that the State Bar is not in the same class as those state agencies that have been placed within the executive branch: "No law of this state restricting, or prescribing a mode of procedure for the exercise of powers of state public bodies or state agencies, or classes thereof, including, but not by way of limitation, the provisions contained in [Government Code sections pertaining to executive branch agencies and personnel,[9]] shall be applicable to the State Bar, unless the Legislature expressly so declares." (§ 6001.)

Thus, although the State Bar originally was purely a legislative creation, its unique nature has been recognized by the Legislature throughout the existence of the bar. The State Bar's special character further was emphasized when it became a constitutional body, placed within the judicial article of the California Constitution, and thus expressly acknowledged as an integral part of the judicial function. The roles of the Legislature and the State Bar, and the relationship of those entities to this court's role in disciplining attorneys, have been characterized consistently by this court.

" 'We have described the bar as "a public corporation created . . . as an administrative arm of this court for the purpose of assisting in matters of

---

[9]"[P]rovisions contained in Division 3 (commencing with Section 11000), Division 4 (commencing with Section 16100), and Part 1 (commencing with Section 18000) and Part 2 (commencing with Section 18500) of Division 5, of Title 2 of the Government Code . . . ." (§ 6001.)

admission and discipline of attorneys." [Citation.] In those two areas, the bar's role has consistently been articulated as that of an administrative assistant to or adjunct of this court, which nonetheless retains its inherent judicial authority to disbar or suspend attorneys. [Citations.]' (*Saleeby* v. *State Bar* (1985) 39 Cal.3d 547, 557 [216 Cal.Rptr. 367, 702 P.2d 525]; see also *Keller* v. *State Bar of California*[, *supra*,] 496 U.S. 1, [11-12] [110 L.Ed.2d 1, 13, 110 S.Ct. 2228].) Thus the judicial power in disciplinary matters remains with this court, and was not delegated to the State Bar." (*Lebbos* v. *State Bar, supra,* 53 Cal.3d 37, 47-48.)

"[The State Bar] is not an administrative board in the ordinary sense of the phrase. It is *sui generis*. In disciplinary matters (and in many of its other functions) it proceeds as an arm of this court. If the Legislature had not recognized this fact, and made provision therefor, the constitutionality of those portions of the State Bar Act which provide for the admission, discipline and disbarment of attorneys could have been seriously challenged on the ground of legislative infringement on the judicial prerogative. Historically, the courts, alone, have controlled admission, discipline and disbarment of persons entitled to practice before them [citations]. In adopting the statutory system now existing in California, the Legislature did not attempt to alter this basic concept. . . . [¶] It follows that in matters of discipline and disbarment, the State Bar is but an arm of this court, and that this court retains its power to control any such disciplinary proceeding at any step. [Citation.]" (*Brotsky* v. *State Bar* (1962) 57 Cal.2d 287, 300-301 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310].)

As the foregoing passage indicates, section 6087's express legislative recognition of reserved judicial power over admission and discipline is critical to the constitutionality of the State Bar Act. Soon after its passage, the act was challenged as an unconstitutional investment of the State Bar Board of Governors with judicial powers. Emphasizing provisions in the act permitting review by this court and reserving our power, as it existed before the act, to disbar or discipline attorneys, we upheld the statutory scheme: "[A]ny decision which the Board of Bar Governors may be empowered or minded to make in a proceeding pending before it is merely recommendatory in character and has no other or further finality in effecting the disbarment, suspension or discipline . . . . If the foregoing is to be held, as we clearly think it is, to express the full measure of the legislative intent in the formulation of said section, it follows necessarily that the Board of Bar Governors created under the provisions of the act have not thereby been invested with any powers which can be said to possess the finality and effect of judicial orders, and that in that respect, at least, the legislature in the passing of the act cannot be held to have in any degree violated the

inhibition of [former] section 1 [now section 3] of article III of the state Constitution relative to the distribution of governmental powers." (*In re Shattuck* (1929) 208 Cal. 6, 12 [279 P. 998].)

Confronting a related issue a few months later in *Brydonjack* v. *State Bar* (1929) 208 Cal. 439 [281 P. 1018, 66 A.L.R. 1507], we considered whether the State Bar Act deprived this court of authority to admit an applicant over the contrary recommendation of the State Bar's Committee of Bar Examiners. While acknowledging the Legislature's power to place restrictions upon the practice of law, we observed: "[*T*]*he legislature may put reasonable restrictions upon constitutional functions of the courts provided they do not defeat or materially impair the exercise of those functions.* This power has been described as follows: '. . . the mere procedure by which jurisdiction is to be exercised may be prescribed by the Legislature, unless, indeed, such regulations should be found to substantially impair the constitutional powers of the courts, or practically defeat their exercise.' [Citations.]" (*Id.* at p. 444, italics added.) The court in *Brydonjack* concluded that the statute investing the committee with the authority to fix and determine the qualifications for admission and to recommend admission of applicants who fulfill those requirements, did not confer any judicial powers upon the committee. We stated: "In all fairness to the legislative intent, said section under consideration does not in the least purport to give finality to any act of the board of bar examiners respecting admissions. The qualifications to be met are not fixed except with the consent of this court, which is but an indirect way of saying that in effect the qualifications for admission are fixed by the authority having power to make orders of admission. The making of orders of admission is, as already observed, clearly a judicial act of this court. . . . [¶] *Our conclusion, then, is that the legislature in its wisdom has placed at the disposal of this court a competent and effective body to aid it in the important function of admissions to the bar.* . . . [T]he power in this court is plenary to admit those who have in our opinion met the prescribed test, whether the investigators do or do not agree with this conclusion." (*Id.* at pp. 445-446, italics added.)

 The premise of the argument that our imposition of a fee upon attorneys to fund the State Bar's existing disciplinary system would violate the separation of powers doctrine is that the State Bar is a legislatively created entity that may be funded solely by the Legislature. As we have seen, however, the State Bar is a *constitutional* entity subject to our expressly reserved power over admission and discipline. The State Bar Act did not delegate to the State Bar, the Legislature, the executive branch, or any other entity our inherent judicial authority over the discipline of attorneys. Because that inherent authority includes the power to require attorneys to pay

fees in support of a disciplinary system, we would not be exercising an exclusive legislative function or usurping any legislative power by imposing such fees and utilizing the State Bar's existing disciplinary structure to process disciplinary matters.

█ The circumstance that the Legislature historically has set the amount of dues paid by attorneys to fund the State Bar's disciplinary system (e.g., §§ 6140, 6140.1, 6140.3, 6140.4, 6140.6, 6140.9) does not alter our conclusion that we have independent authority to impose such fees. We long have recognized the Legislature's authority to adopt measures regarding the practice of law.. "[T]he power of the legislature to impose reasonable regulations upon the practice of the law has been recognized in this state almost from the inception of statehood." (*Brydonjack* v. *State Bar, supra,* 208 Cal. 439, 443.) "[T]his court has respected the exercise by the Legislature, under the police power, of 'a reasonable degree of regulation and control over the profession and practice of law . . .' in this state. [Citations.] This pragmatic approach is grounded in this court's recognition that the separation of powers principle does not command 'a hermetic sealing off of the three branches of Government from one another.' [Citation.]" (*Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d 329, 337-338, fn. omitted; see also *Santa Clara County Counsel Attys. Assn.* v. *Woodside, supra,* 7 Cal.4th 525, 543 ["In the field of attorney-client conduct, we recognize that the judiciary and the Legislature are in some sense partners in regulation."].)

Such legislative regulation of matters related to the admission and discipline of attorneys is neither exclusive nor final, however. "[L]egislative regulations [regarding the qualifications of attorneys] are, at best, but minimum standards unless the courts themselves are satisfied that such qualifications as are prescribed by legislative enactment are sufficient. . . . *In other words, the courts in the exercise of their inherent power may demand more than the legislature has required.* [Citations.]" (*In re Lavine* (1935) 2 Cal.2d 324, 328, italics added.) Moreover, "[w]e deem it established without serious challenge that legislative enactments relating to admission to practice law are valid only to the extent they do not conflict with rules for admission adopted or approved by the judiciary. When conflict exists, the legislative enactment must give way." (*Merco Constr. Engineers, Inc.* v. *Municipal Court* (1978) 21 Cal.3d 724, 728-729 [147 Cal.Rptr. 631, 581 P.2d 636].) "We are not authorized, of course, to reject in the usual course of our judicial function a legislative enactment merely because we deem it serves no desirable purpose. But when the matter at issue involves minimum standards for engaging in the practice of law, *it is this court and not the Legislature which is [the] final policy maker.*" (*Id.* at p. 731, italics added.)

"This court must . . . heed its primary policy-making role and its responsibility in matters concerning the practice of law. [Citation.] In this regard,

the most authoritative study done to date on disciplinary structures and procedures concluded that it is not sound policy to fragment the authority to discipline lawyers. [¶] . . . [¶] . . . [T]he ' "ideal" disciplinary structure' is one in which 'exclusive disciplinary jurisdiction' is vested in 'the state's highest court,' with a single, specialized disciplinary agency responsible for the preliminary investigation, hearing, and determination of complaints." (*Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d 329, 340-341, quoting ABA, Problems & Recommendations in Disciplinary Enforcement (Final Draft 1970) pp. xiv-xv.)

Although we consistently have recognized and valued the role of legislative regulation of the practice of law and appropriately deferred to the Legislature's judgment on many subjects, on rare occasions we have invalidated legislative enactments that materially impaired our inherent power over admission and discipline. Thus, in *Hustedt* v. *Workers' Comp. Appeals Bd., supra,* 30 Cal.3d 329, 339-341, we held that the Legislature overreached its authority when it permitted the Workers' Compensation Appeals Board to discipline an attorney by prohibiting him or her from practicing before that board, thus undermining our unlimited, original jurisdiction over disciplinary proceedings. Similarly, in *Merco Constr. Engineers, Inc.* v. *Municipal Court, supra,* 21 Cal.3d 724, 727-733, we determined that the Legislature encroached upon our authority over admission to the practice of law, and thereby violated the separation of powers doctrine, when it provided that a corporation could appear in a civil action through a corporate officer who is not an attorney. (See also *In re Lavine, supra,* 2 Cal.2d 324, 329 [invalidating a statute requiring readmission of attorneys who were pardoned after disbarment for felony convictions]; cf. *Superior Court* v. *County of Mendocino* (1996) 13 Cal.4th 45, 60-61 [51 Cal.Rptr.2d 837, 913 P.2d 1046] [upholding facial validity of a statutory designation of one or more unpaid furlough days on which trial courts shall not be in session, because the statute would not *necessarily* defeat or materially impair a court's fulfillment of its constitutional duties].)

Therefore, our traditional respect for legislative regulation of the practice of law, based upon principles of comity and pragmatism, is not to be viewed as an abdication of our inherent responsibility and authority over the core functions of admission and discipline of attorneys. As another state's highest court has observed: "The claim of inherent judicial power is no novelty. There are many cases in which it has been invoked over the membership of the bar. It has been invoked in the admission, suspension, discipline and disbarment of attorneys and in these no legislative permission is considered requisite, and, *if a statute exists, it is regarded as declaratory of the inherent power of the judiciary and not exclusive in its provisions.*" (*In re Integration*

*of Nebraska State Bar Ass'n* (1937) 133 Neb. 283 [275 N.W. 265, 267, 114 A.L.R. 151], italics added; accord, *People* v. *Goodman* (1937) 366 Ill. 346 [8 N.E.2d 941, 944, 111 A.L.R. 1] ["The power to regulate and define the practice of law is a prerogative of the judicial department . . . . The legislative department may pass acts declaring the unauthorized practice of law illegal and punishable. Such statutes are merely in aid of, and do not supersede or detract from, the power of the judicial department to control the practice of law."]; *People* v. *Culkin* (1928) 248 N.Y. 465 [162 N.E. 487, 492, 60 A.L.R. 851] [state constitutional and statutory provisions authorizing the court to regulate attorneys were "declaratory of a jurisdiction that would have been implied, if not expressed"]; *Banales* v. *Jackson, supra,* 601 S.W.2d 508, 511 ["The original act creating the integrated bar was simply legislative recognition of the inherent power of the judicial department to regulate the practice of law."]; *Washington State Bar Ass'n* v. *State, supra,* 890 P.2d 1047, 1051 [" '[T]he state has a substantial interest in maintaining a competent bar, and the legislature, under the police power, may act to protect the public interest, but in so doing, it acts in aid of the judiciary and does not supersede or detract from the power of the courts.' " (Italics omitted.)];[10] *West Virginia State Bar* v. *Earley* (1959) 144 W.Va. 504 [109 S.E.2d 420, 438] ["A statute which provides that the supreme court shall, by general or special rules, regulate admission of attorneys to practice in state courts is declaratory of power inherent in the supreme court to supervise, regulate and control generally the practice of law."].)

Decisions in other states have considered the inherent power of the courts to impose fees notwithstanding legislative enactments specifying the amount of dues paid by attorneys to fund a disciplinary system. For example, the Mississippi State Bar petitioned that state's highest court seeking, among other things, imposition of a special annual assessment upon each member of the bar "for purposes of financing the disciplinary activities and agencies" described in the statutes creating the bar's various entities responsible for discipline of attorneys. (*Matter of Mississippi State Bar* (Miss. 1978) 361 So.2d 503, 504.) The court observed that it has exclusive and inherent disciplinary jurisdiction over attorneys in the state, and that the legislature had established various agencies for purposes of assisting the court in the administration of its disciplinary jurisdiction. It further noted that the bar's governing board, although created by statute, "is an agency of [the] Court for disciplinary purposes, and when it acts within that agency, it acts for [the] Court in a function separate and distinct from that of the governing body of the Bar." (*Id.* at p. 505.) Because of an increasing number of complaints against attorneys and rising costs, the board could not discharge its disciplinary functions "on the funds made available by the collection of dues

---

[10](Quoting 7 Am.Jur.2d (1980) Attorneys at Law, § 2, pp. 55-56; see 7 Am.Jur.2d (2d ed. 1997) Attorneys at Law, § 2, pp. 66-67.)

without grave and imminent danger to both the discharge of that disciplinary agency and the other good and proper duties and functions of the Bar which the dues were also intended to support." (*Id.* at p. 506.) In deciding to grant the bar's petition, the court explained its reasoning as follows: "This Court's duty to protect itself, the judiciary, and the citizens of this State from persons unfit to practice law [citation] should not be hampered by the absence of adequate financing to do the job, and the ability to secure such financing should not be dependent upon the will of a department or entity other than the entity upon which the ultimate burden rests, namely, this Court. [¶] . . . It is the duty of this Court to assure such financing so its agencies can properly and meaningfully discharge the 'jurisdiction and lawful powers as are necessary to conduct a proper and speedy disposition of any complaint' . . . [citation]." (*Ibid.*) The court permitted the bar to impose a special annual assessment of $25, in addition to the dues set by statute, upon all dues-paying attorneys. (*Ibid.*; see also *Banales* v. *Jackson, supra,* 601 S.W.2d 508, 512 ["[W]hen a provision of the State Bar Act conflicts with orders of the Supreme Court regarding attorney conduct *as to fees or other related matters,* the statutory provisions must yield to the Court's rules . . . ." (Italics added.)].)

The Governor acknowledges the Mississippi Supreme Court's action in the case described above, but he dismisses the opinion as an "aberration" that did not analyze whether that court could exercise its inherent power in the face of existing legislation on the subject. We disagree with this characterization of the decision. Although the opinion does not engage in a lengthy discussion of the separation of powers doctrine, it acknowledges the doctrine, recognizes the legislative scheme, relies upon its well-established inherent powers, and concludes that the court's duty to protect the judiciary and the public from persons unfit to practice law should not be hampered by the will of other branches of government. The Mississippi court's analysis and conclusion are consistent with the unanimous view of courts throughout the nation, including this court, that the inherent power over discipline of attorneys rests in the judiciary, and that legislative action (or inaction) may not defeat that power. To the extent the opinion holds that a state's highest court may assess fees upon attorneys to ensure the existence of a functioning disciplinary system that was created by statute, we find the Mississippi decision instructive.

Opponents of the State Bar's request argue that this court's imposition of additional fees upon attorneys for the purpose of attorney discipline would violate the separation of powers doctrine because such action would substitute our own policy decision for that of the Legislature, thereby constituting a legislative enactment, amendment, or repeal. They rely, for

example, upon decisions holding that a court may reform a statute to preserve its constitutionality only if "doing so closely effectuates policy judgments clearly articulated by the enacting body, and . . . the enacting body would have preferred such a reformed version of the statute over the invalid and unenforceable statute" (*Kopp* v. *Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 626 [47 Cal.Rptr.2d 108, 905 P.2d 1248] (lead opn.)), and that "the Courts have no means, and no power, to avoid the effects of [legislative] *non-action*[;] . . . [t]herefore, when the Legislature fails to make an appropriation, [the courts] cannot remedy that evil" (*Myers* v. *English*, *supra*, 9 Cal. 341, 349).

Such decisions are inapposite. As we have explained, statutes specifying the amount of bar dues designated for the State Bar's disciplinary system are declaratory of and in aid of this court's inherent authority to assess independently such dues. In exercising our disciplinary powers over attorneys, we "may demand more than the legislature has required" in its regulation of the same area. (*In re Lavine*, *supra*, 2 Cal.2d 324, 328.)

Furthermore, nothing in the existing statutory provisions suggests that the Legislature intended to preclude this court from acting in this realm. Although a variety of statutes authorize the State Bar to impose fees upon its members, no statute purports to preclude this court from imposing fees upon attorneys if we conclude that such funds are required to maintain an adequate attorney disciplinary system.[11] As in *In re Shattuck*, *supra*, 208 Cal. 6, and *Brydonjack* v. *State Bar*, *supra*, 208 Cal. 439, there is no reason to interpret the existing statutes in a manner that would raise serious constitutional questions. Of course, we traditionally have deferred to the Legislature's determination of the precise amount of fees necessary to fund an effective disciplinary process. Where the Legislature has not made that determination or assessed such fees, however, we appropriately may decide to take action to avert a shutdown of the disciplinary system.

Finally, contrary to the suggestion of the Governor and others responding to the State Bar's request, we believe there is nothing in the general separation of powers principle of comity that suggests that this court should establish its own, separate disciplinary system rather than utilize the disciplinary structure and mechanisms already in place in the State Bar. The statutes underlying the State Bar's disciplinary process have not been repealed, but continue to exist and to impose obligations upon the State Bar

---

[11]At present, the bar is authorized by statute to collect $27 per year from each attorney to fund a disciplinary system. (§§ 6140.6, 6140.9.) These statutes, however, expressly indicate that the $27 fee was intended to be imposed *in addition to* the basic annual membership fee ordinarily authorized by section 6140. There is no indication the Legislature contemplated that the supplemental $27 fee, by itself, would be sufficient to fund an effective disciplinary system.

with regard to the investigation and prosecution of disciplinary complaints filed against members of the bar. The Governor does not suggest that this court has no authority to make use of the existing statutory State Bar structure. Thus, he argues we could redirect funding that is collected pursuant to existing statutes, and that we could use other State Bar resources pursuant to section 6008, which declares all property of the State Bar "to be held for essential public and governmental purposes in the judicial branch of the government." Similarly, other commentators who recommend placing the disciplinary structure under the control of this court or the Administrative Office of the Courts do not argue that the entire existing statutory framework would be of no force and effect. It is difficult to understand why it would be more respectful of the Legislature for this court to establish its own distinct disciplinary structure than to utilize, with appropriate oversight, the existing statutorily created disciplinary structure of the State Bar.[12]

In sum, we determine that the State Bar is not an entity created solely by the Legislature or within the Legislature's exclusive control, but rather is a constitutional entity subject to this court's expressly reserved, primary, inherent authority over admission and discipline. The State Bar Act did not divest this court of any of its preexisting powers related to discipline, including the power to create and fund a disciplinary system through the assessment of fees upon attorneys. Statutes providing for the assessment of dues to fund a disciplinary system are not exclusive—but are supplementary to, and in aid of, our inherent authority in this area.

Accordingly, we conclude that our inherent constitutional authority over attorney discipline includes the power to assess fees upon attorneys to fund the State Bar's existing discipline system. We note that this same conclusion also has been reached in submissions filed in this matter by the Attorney General, the chair of the Senate Committee on Judiciary, the American Bar Association, the California Association of Local Bars, as well as individual local bar associations and specialty bar associations representing approximately 100,000 California attorneys. This court has the power as well as the responsibility to ensure that the public, the courts, and the legal profession are protected by an adequate, functioning attorney disciplinary system.

## III

Having determined that this court has the authority to impose a regulatory fee on attorneys to support an attorney disciplinary system, we

---

[12]We observe that at the hearing of this matter, the Governor's legal affairs secretary modified the position set forth in the Governor's brief, and stated that it would be appropriate for this court to appoint a special master to determine which of the State Bar's disciplinary functions should be funded, and the extent of such funding.

must further consider whether this court should act at this time, and, if so, in what manner.

In deciding whether the court should take action now, several factors are relevant. First and foremost is the public impact of the absence of an effective disciplinary system. Many of the submissions that the court has received, as well as numerous recent editorials and articles, have emphasized the potential dangers to the public, the legal profession, and the courts.[13] Both the Governor and the State Bar agreed in their written and oral submissions that there is a significant risk to the public as the result of an inadequately funded disciplinary system. Their argument has not been about whether the public deserves protection, but about what form that protection should take.

## A. *Need for an Attorney Discipline System*

### 1. *Public protection*

██ Some of those submitting comments have suggested that there is no real need for a discipline system, and, instead, that attorney misconduct should be dealt with exclusively through criminal complaints and civil law suits brought by injured clients.[14] That would place attorneys in a unique position: every other licensed profession in the state of which we are aware is regulated by a board that has the power to suspend or revoke the license of an errant practitioner—and practitioners pay a fee for licensure. Moreover, many complaints that properly lead to discipline are not necessarily susceptible to relief through a court action. The amount of money involved may not be sufficient to justify the considerable expense of litigation. The conduct at

---

[13]Several speakers at the November 9th hearing emphasized the increasing difficulties and frustrations encountered by clients and other consumers who have nowhere to turn to bring complaints against attorneys as a result of the virtual closure of the State Bar's disciplinary system. For example, Mr. de la Vergne, from the Sacramento Bar Association, described increased complaints, and the inability of his organization to respond, due to inadequate resources and limited jurisdiction. A letter submitted by President Philip S. Anderson of the American Bar Association observed that its Center for Professional Responsibility had "received numerous inquiries" from individuals in California seeking guidance on possible recourse now that there was no functioning discipline system. State Bar President Raymond C. Marshall, and Attorney Jerome B. Falk, Jr., representing numerous local and specialty bars, also commented on the increasing impact of the funding impasse on the public. Professor Sims stressed that delay in answering complaints magnifies their gravity from the perspective of a complainant.

[14]See comments submitted by Fred J. Hiestand on behalf of Senators Ray Haynes and Ken Maddy, Assemblymembers Dick Ackerman and Bill Morrow, former state Senator Barry Keene, and San Diego City Councilman J. Bruce Henderson. Senator Ross Johnson has joined in Mr. Hiestand's comments, and Attorneys Branford Henschel and Ronald Silverton have submitted similar suggestions.

issue may be ripe for discipline only after it has been repeated. The criminal violation involved may be one that most district attorneys do not have the resources to pursue (as is evidenced by the fact that many violations of the professional rules of conduct that potentially might be pursued as criminal matters presently are left to the disciplinary system). More generally, the objective of the discipline system is not punishment of the attorney, but protection of the public.[15] "The basic purpose [of disciplinary proceedings] is to protect the public and the profession from the objectionable activities of persons unfit to practice law, and a disciplinary proceeding is not a criminal action. [Citations.]" (1 Witkin, Cal. Procedure, *supra*, Attorneys, § 623, p. 737.) Finally, an added consequence of encouraging litigation would be to impose an additional burden on the courts.

Civil and criminal court actions also would not protect future clients adequately from potentially damaging conduct by attorneys. Many attorneys who are disciplined do not have the funds to pay judgments against them (which is why the Legislature created the Client Security Fund). Thus, leaving civil proceedings as the only recourse against such attorneys not only would not result in recovery for the injured client, but also would not protect future clients from harm. Licensing serves a separate function from enforcement through court action. Licensing ensures that only those qualified to practice a profession are entitled to serve the public. If litigation alone were sufficient to protect the public from harm, and the free market capable of taking care of those who are not qualified or who engage in malpractice, the need for an effective licensing system for any profession would be undercut.[16] To the contrary, however, the inadequacy of this remedy for regulating not only attorneys, but many other professionals and practitioners, has been made patently clear by the consistent and widespread reliance our society places on licensing systems to provide public protection and enforce a basic standard of conduct for those providing a host of services. We find it highly significant that no other jurisdiction relies solely upon legal malpractice actions and criminal prosecutions to protect the public from lawyers who commit misconduct, and there was no suggestion during the legislative process to eliminate the attorney disciplinary system entirely. In fact, the disciplinary system itself was not the focus of criticism by those who sought to reform the bar's structure or governance.

Society has found that the regulation of various professions through licensing is an essential companion to the relief available through civil and

[15]As Michael J. Oths, President of the National Organization of Bar Counsel, observed in his oral presentation to the court, standards governing professional conduct and responsibility are set forth in a code separate from the criminal and general civil codes.

[16]Thus, were we to conclude that a discipline system is unnecessary for the reasons asserted, doubt would be cast upon the necessity of admitting individuals to practice before the courts. Indeed, the same would be true for any profession: anyone asserting expertise could offer services.

criminal litigation. One needs only to consider the implications of a system under which the oversight of physicians or building contractors were left solely to negligence, medical malpractice, and criminal complaints, in order to appreciate the complementary and important role played by a licensing and related disciplinary system. As we have discussed, the role of the courts in regulating attorney conduct recognizes the role of attorneys as officers of the court. We conclude that leaving the regulation of attorney misconduct solely to the civil and criminal litigation system would not be sufficient to protect the public or to discharge our responsibilities in this regard.

 At the present time, because there is no functioning disciplinary system capable of investigating and adjudicating attorney misconduct, attorneys deserving of discipline are left to continue their practice and to harm additional clients. At the same time, unfounded complaints cannot be disposed of in timely fashion. Aggrieved individuals with claims unsuitable for litigation are unable to obtain relief. Even if errant attorneys eventually will be dealt with through whatever disciplinary system emerges through legislative action in the future, the number of clients who may be injured will increase the longer the delay. The profession, clients, and the courts all suffer when the practices of unscrupulous attorneys distort outcomes, create difficulties and expense for opposing counsel and litigants, and generally raise the level of distrust within and about the legal profession. Every attorney suffers if the public believes that errant attorneys will not be subjected to appropriate discipline and can practice unchecked and unregulated.

In recent years, there has been a great deal of discussion about professionalism and the practice of law. An unregulated profession soon may lose its right to call itself a profession, as public doubts about the fairness of the practice of law and of the courts increase. The courts suffer not only as such doubts in the integrity of the profession and the legal system grow, but suffer also because the courts rightfully may be considered responsible when they fail to act to protect the public despite their authority to do so. Thus, the interests of the public, the legal system, and the courts all benefit from the existence of a functioning and effective attorney disciplinary system.

### 2. Impact on the court's oversight of attorney discipline

This court has an additional direct interest in the existence of a strong disciplinary system. Our active role in overseeing the attorney disciplinary system has been continuous and, in years past, required a considerable portion of our resources. Since the implementation of reforms affecting the State Bar disciplinary process in the late 1980's, however, this court has

been able to reduce considerably its resources devoted to overseeing the process, and instead has relied upon the professionalism and consistency generated by the revised process, particularly that achieved by the newly created State Bar Court. This court's continued ability to place substantial reliance on a reliable and professional administrative arm with regard to attorney discipline serves the public's interest by enabling the court to dedicate more of its finite resources to deciding issues of statewide importance in all areas of the law.

From the enactment of the State Bar Act in 1927, this court has made use of the assistance afforded by the State Bar to enable it more effectively to process disciplinary matters—and to handle its additional workload as well. In *In re Walker* (1948) 32 Cal.2d 488 [196 P.2d 882], we acknowledged that "this court obviously has the same powers which it previously possessed independently to entertain disciplinary proceedings despite possible duplication between such proceedings and others instituted before [t]he State Bar." (*Id.* at p. 490.) Nevertheless, relying on the existence of the bar's disciplinary system, we explained that "we are of the view that as a matter of policy this court should not exercise those powers unless and until the accuser has followed the normal procedure by first invoking the disciplinary power of [t]he State Bar." (*Ibid.*)

For most of the bar's history, its disciplinary system was operated primarily with the assistance of volunteers from local bar associations, although some professional and permanent staff were retained by the State Bar. By the mid-1980's, a substantial backlog of complaints against attorneys had developed, and a series of newspaper articles revealed major inadequacies in the existing disciplinary system. In 1986, the Legislature appointed a special State Bar Discipline Monitor, Robert C. Fellmeth, to report on the bar's backlog and recommend solutions. Discussions between Mr. Fellmeth, the State Bar, and the Legislature resulted in the eventual adoption of Senate Bill No. 1498 during the 1987-1988 legislative session. By that time, the backlog of cases pending before the bar had been reduced from nearly 4,000 to approximately 1,500,[17] and analysis of the pending legislation contained in various reports on the bill suggests that lack of resources threatened this

[17]In his brief, Anthony T. Caso of the Pacific Legal Foundation on behalf of Raymond Brosterhous asserted that the public is better protected today than it was in 1986, and further suggested at oral argument that this is because the backlog of complaints that is now growing includes complaints of varying degrees of merit, while the backlog in 1986 included more serious matters that already had been subject to some investigation and evaluation. We do not, of course, know the composition of the present backlog, but it is not unreasonable to assume that because complainants must make extra efforts to file a written complaint and submit it to the bar, in fact the present backlog contains a larger percentage of serious allegations than the mix of complaints normally processed by the bar discipline system.

progress and the ability of the State Bar to sustain its level of functioning. (See, e.g., Sen., 3d reading analysis of Sen. Bill No. 1498 (1987-1988 Reg. Sess.) as amended Aug. 1, 1988, p. 4.) The bill provided for the creation of the State Bar Court, increased the reporting requirements of courts and insurers regarding misconduct by attorneys, created a process for involuntary inactive enrollment of attorneys, and made numerous additional revisions to disciplinary and other related statutes.

In order to ensure consistency and the orderly development of the law relating to discipline of attorneys, this court kept careful control of attorney discipline through a comprehensive internal review process. Each discipline recommendation was reviewed, whether or not a petition was filed, to determine the appropriateness of the disciplinary sanction recommended to the court by the bar. If a petition was filed by the attorney, the court routinely granted review and issued a written opinion following briefing and oral argument. The court also on its own motion would grant review in matters in which no petition had been filed if it appeared that the bar's recommendation required closer consideration.

As the State Bar's disciplinary system resolved more complaints, the number of Supreme Court opinions on State Bar disciplinary proceedings increased. Between 1980 and 1987, the court issued opinions in between 7 and 20 State Bar matters each year, and averaged 13 cases per year. In 1988, the number climbed to 29, and in the next 2 years rose to 48 and 43. In 1992, however, the number dropped to 22, as a direct result of the establishment of the State Bar Court. For three years thereafter, until 1994, the court's opinion count included no State Bar matters.

The creation of the State Bar Court was accompanied by the adoption of a rule of finality, rule 954 of the California Rules of Court, that changed the court's practice of granting review of every petition filed by an attorney against whom sanctions had been recommended. Instead, subdivision (a) of the rule provides that review will be granted "when it appears (1) necessary to settle important questions of law; (2) the State Bar Court has acted without or in excess of jurisdiction; (3) petitioner did not receive a fair hearing; (4) the decision is not supported by the weight of the evidence; or (5) the recommended discipline is not appropriate in light of the record as a whole." Denial of review constitutes a final judicial determination "on the merits," and the recommendation of the State Bar Court is filed by this court as its order. (*Id.*, subd. (b).) Thus, the creation of the State Bar Court and the adoption of rule 954 signaled an extension of the court's reliance on the State Bar process as originally announced in *In re Walker, supra*, 32 Cal.2d 488. The existence of an increasingly reliable State Bar disciplinary system

has been an important factor in this court's ability to handle an ever-burgeoning workload.[18] The continuing severe disruption or diminution of this system will have a concomitantly deleterious impact on the court.

### B. *Need for Court Action at This Time*

As we have concluded, the court has the authority to impose a fee upon attorneys in order to fund a disciplinary system. The need for public protection and the mounting backlog of cases certainly weigh in favor of taking some action to provide relief. Nevertheless, some of those submitting comments to the court have urged us to await forthcoming legislative action even if we are authorized to proceed at this time. For example, the Governor argued in his written submissions that respect for our sister branches would militate against the exercise of our authority at this time. He urged us to defer until the newly elected Governor and Legislature are in place, and to permit the Legislature to provide appropriate restrictions on the use of any moneys provided to the bar.[19]

At present, the Legislature is in recess and will reconvene, with its newly elected members, in early December. Typically, during its initial brief organizational session at that time, the Legislature does not deal with substantive issues. Governor Wilson could call a special session (see Cal. Const., art. IV, § 3, subd. (b)), but at the hearing, counsel for the Governor confirmed that it is extremely unlikely that he would do so, and that he instead would defer to the next Governor. Moreover, given the timing of the start of the legislative session, and the swearing-in of the new Governor in early January, it is difficult to ascertain which entities could craft a compromise that would be enacted before January 1999.

It has been suggested by some that the court wait to take action until after the Legislature reconvenes for business in January and the new Governor has been sworn in. Deferring action pending the reconvening of the Legislature and the new Governor's assumption of office might appear superficially similar to the action taken by the court in 1986 when, following adjournment

---

[18]All this has occurred against a backdrop of a rapidly increasing number of practicing attorneys. In 1970, 33,788 attorneys were licensed to practice in California. Over the ensuing decades, the numbers rose to 68,538 in 1980, 108,531 in 1990, and 130,659 today. In short, the population governed by the attorney discipline system has almost quadrupled over the past three decades—at the same time the number of petitions for review in non-attorney-discipline matters in this court has more than doubled.

[19]As mentioned previously, at the hearing on this matter the Governor's legal affairs secretary expressed the view that this court's appointment of a special master would be consistent with the Governor's position if the special master were charged with determining which discipline-related functions should be funded, and the extent to which they should be funded with money from the court's assessment of a special fee on attorneys.

of the Legislature without adoption of a dues bill, the State Bar requested that this court assess fees upon attorneys for 1987 in the same amount as imposed by statute for 1986. The current situation, however, is significantly distinct.

The first critical difference is that an entire year now has passed without a fee bill being in effect. In 1986, the court's deferral occurred at the end of a year in which fees already had been collected, and no layoffs or other restrictions on the bar's ability to perform its disciplinary and other responsibilities had occurred. Second, in 1986 the State Bar sought the full amount of dues previously imposed; in contrast, the amount now requested is only that necessary to support the basic disciplinary functions of the bar.

Furthermore, deferral would delay for substantial additional time—at a minimum one month, but likely far longer—the start of any restoration of a disciplinary system in the state. Should the Legislature and the Governor decide to establish a totally new system or to make major adjustments in the existing but largely nonfunctional one, the start-up time before the system would be able to handle complaints expeditiously will increase. Additional uncertainty and delays will mean further dispersal of the State Bar's disciplinary staff and additional difficulties in assembling a staff of employees capable of performing the necessary functions. The backlog of complaints will continue to grow, making it more difficult for the disciplinary system once in operation to handle the task of processing the backlog, to start up a complex organization, and to respond successfully to new complaints. According to its request filed on September 30, 1998, the layoffs in June 1998 resulting from the lack of a fee bill reduced the staff of the Office of the Chief Trial Counsel, which receives, investigates, and prosecutes disciplinary complaints, from 283 to 20 employees. Work was suspended on 4,459 open investigations. The bar closed its consumer complaint hotline, but, at this court's request, informed potential complainants that they could submit a written complaint that would be processed once the bar was able to process them. As of September 30, the bar had received 2,097 new written complaints. As the bar notes, this total of more than 6,000 pending complaints exceeds the 1985 backlog that generated widespread criticism. The State Bar Court similarly dismissed most of its employees and has suspended proceedings in all but a few pending or egregious matters. The State Bar judges, who are appointed by this court, have been working for less than full salary. Protection of the public would continue to suffer as further delays in processing matters might well surpass the time frames that led to the public outcry in the 1980's.

Nor do we believe, as some have suggested, that action by the court at the present time will "take the pressure off" the other two branches to find a

solution. Our action—imposing a fee on attorneys to be used solely for the attorney discipline system—will not affect most of the critical issues that were the points of contention among the parties in Sacramento, including the State Bar's governance, the permissible scope of its lobbying activity, the role of the State Bar Conference of Delegates, or other functions of the bar beyond discipline. Moreover, as discussed below, the $171.44 figure requested, when added to the additional $77 available after January 1, 1999, under existing statutes, amounts to far less than the fee amounts that would have been imposed under any of the alternative proposals advanced during the legislative session. Thus, even with respect to discipline, the State Bar is likely to seek additional funding from the Legislature, and the bar's president confirmed this intention during his oral presentation. Accordingly, all of the issues concerning the future of the State Bar will remain to be resolved in Sacramento regardless of what action this court takes in the present proceeding.

In addition, although some new participants will be involved in Sacramento, recent history suggests that the outstanding questions concerning the bar's operations may not readily be susceptible to quick resolution. This court already demonstrated its deference to the legislative and executive branches by its action in June of this year, when it specifically declined to intervene while a legislative solution actively was being pursued. No such compromise or solution has been reached, however, and if the court were to continue to decline to act now, in the face of the continued and increasing risk to the public, it reasonably could be viewed as shirking its primary constitutional responsibility over attorney discipline.

Even if a bill is enacted soon after January 1, 1999, it may well not take effect until January 1, 2000, pursuant to article IV, section 8, subdivision (c)(1) of the California Constitution. Only an urgency statute, requiring a two-thirds vote, would take effect immediately upon enactment. (*Id.*, art. IV, § 8, subd. (c)(3).) Although it is possible that the Legislature and the Governor will arrive at a solution that will garner the necessary two-thirds vote, there is no guarantee of success in the near future, and it is equally likely that any compromise will receive no more than a simple majority vote.

As we have explained, the court has inherent authority and ultimate responsibility in this area. Our action in the face of an existing impasse of this magnitude would be neither improperly intrusive nor unprecedented. (Cf. *Wilson* v. *Eu* (1991) 54 Cal.3d 471, 473 [286 Cal.Rptr. 280, 816 P.2d 1306] [Reapportionment primarily is a matter for the legislative branch, and we urged the Legislature and the Governor to exercise their shared powers to enact a reapportionment plan. "But because the impasse may continue

indefinitely, because ' "it is our duty to insure the electorate equal protection of the laws" [citation]' [citation], and because California is entitled to seven additional congressional seats based on the 1990 census, we must proceed forthwith to draft such plans."].) Given the public interests that are at grave risk, the now long-standing deadlock that has devastated the ability of the existing system to function, and the court's inherent power and authority in this area, we find that it is reasonable and necessary to discharge our primary responsibilities in this area. At the same time, we also shall seek to use the least intrusive means possible in effectuating our goals.[20]

C. *Should the Court Use the Existing State Bar Disciplinary System or Resources?*

In his written response, the Governor asserted that imposition of a fee by this court to fund the State Bar in effect would supplant the Legislature's determination not to provide additional fees for a legislatively established entity, violate the separation of powers, and upset the traditional deference this court has shown to the Legislature concerning the setting of fees. He urged instead that the court essentially create an entirely new disciplinary system directly under our control. Others similarly argue that the Legislature made a determination not to impose fees and that any action by the court— particularly one that makes use of the existing bar disciplinary structure— would amount to overruling that determination. We note first the impracticality and inefficiency of this court's creating a disciplinary system from whole cloth—especially as an interim solution. The Governor and others implicitly seem to recognize this difficulty when they also urge that the court use existing bar resources and special funds to support the discipline system.[21]

Their argument that we should use the *resources* of the bar but cannot use its *structure* seems inconsistent with the arguments of these proponents

---

[20]Senator Kopp and Professor Barnett have urged the court to place the supervision of the attorney disciplinary system under the aegis of the Administrative Office of the Courts (the AOC). They apparently assume that the AOC is an administrative arm of the Supreme Court, when in fact it is the staff arm of the Judicial Council and not part of this court. Although the AOC provides services to this court (as well as to all other courts in the state), it acts pursuant to its constitutional and statutory authority in service to the Judicial Council.

Any action taken by the court under the present circumstances should not be viewed as an indication that the court favors transfer of the disciplinary system (whether the State Bar Court alone, or the entire structure) to the supervision of the court, either directly or through the AOC.

[21]For example, Senator Kopp and Professor Barnett suggested that the court could use the State Bar's real property to support disciplinary functions. The Governor also argued that we could use money appropriated to Supreme Court operations to support the disciplinary system.

concerning the appropriate demarcation of authority between the court and the Legislature. In our view, it would be far more intrusive for the court to exert authority over resources that the bar has available to it under previous legislative authorization that dedicates these resources to purposes other than discipline, than to impose additional fees to support the existing disciplinary system. For example, as noted earlier, only $27 of the $77 currently collected for dues may be used for discipline under the existing statutory scheme. The other $50 is collected by the bar, pursuant to statute, for express purposes other than discipline.[22] Tampering with the existing resources collected and allocated to the bar pursuant to valid existing legislation, particularly funds designated for uses other than discipline, would not be deferential to the Legislature's traditional and continuing role in this area.

The Governor's written submission also refers to section 6008, which states that "All property of the State Bar is hereby declared to be held for essential public and governmental purposes in the judicial branch of the government and such property is exempt from all [state or local] taxes," and suggests that this statute would authorize the court to determine how existing funds should be allocated. The contemporaneous reports in the Journal of the State Bar regarding the purpose of Senate Bill No. 201 (1957 Reg. Sess.) adopting this and other related provisions indicates that they were intended to permit the Bar to finance construction of two office buildings, and to facilitate the bar's ability to borrow money and do all things necessary to undertake this task. (Legislation Reports (1957) 32 State Bar J. 25, 398.) These provisions, including section 6008, were not intended to suggest that all of the State Bar's funds were freely available to the Supreme Court for reallocation as the court might desire. In fact, this argument once again conflicts with the claim that the court's imposition of a fee improperly would invade the legislative prerogative, to the extent the argument is premised generally on the assumption that the court effectively has the power to appropriate funds that the Legislature has authorized the bar to collect; as explained above, reappropriating such funds to support a separate, newly created discipline system would be far more intrusive on the legislative function than assessing an additional fee to support the legislatively created system that now exists.

---

[22]At oral argument, Raymond C. Marshall, President of the State Bar, explained that money from the sale of the State Bar's property in San Francisco was earmarked by the Legislature for the bar's Building Fund, and any money arising out of the sale, loan, or interest relating to the building is so restricted. Generally, he observed, the Legislature has earmarked certain funds for restricted purposes, and the use of these funds is restricted to those uses, unless a surplus exists. (See, e.g., §§ 6140.3 [specified additional fee amount "may be used only for" transactions relating to facilities], 6140.5 [Client Security Fund], 6140.9 [$2 fee to be used first for discipline monitor and, after expiration of the contract term, applied to support discipline].)

## D. *Other Alternatives*

Additional alternatives have been suggested by the Governor and others, but as indicated below, on closer examination they do not appear to provide viable alternatives under the existing conditions. The Governor in his response outlined a series of suggestions, which are discussed in the margin.[23]

[23]The Governor specifically raised the following options:

(1) Use existing bar resources to finance the discipline system until the end of the fiscal year, and ask the Legislature for funds to support the disciplinary system "as part of the [Supreme Court] budget that commences on July 1, 1999." This approach contemplates that the court immediately would assume direct control of and fiscal responsibility for the bar, utilizing the existing bar funds augmented as necessary by the court's own existing limited budget. (At oral argument, the Governor's legal affairs secretary acknowledged that the $27 now available to support the disciplinary system is insufficient, and that a request by the court for supplemental funding would be required.) The court does not have the present resources to undertake this task, nor would it be prudent or reasonable to expect the court to divert, to the support of the bar, funds appropriated to the court by the Legislature for other important purposes. Furthermore, there are no guarantees that the Legislature would respond positively to a request for supplemental funding.

(2) Use the $27 collected under sections 6140.6 and 6140.9 to pay for the full complement of judges and staff of the State Bar Court for the remaining six months of the fiscal year—or staff a limited State Bar Court and use some of these funds for other purposes. A State Bar Court without a staffed Office of Trial Counsel to investigate and prosecute matters before it would have few matters to address. Moreover, the suggestion also contemplates that the court would include in its budget for the next fiscal year the funds to operate a full discipline system.

(3) Use other existing State Bar resources, including the more than $10 million in equity in its real estate. As noted previously, the money invested in real estate is part of the building fund that is expressly dedicated by statute to specific purposes, not including discipline. The same holds true for money deposited in the Client Security Fund, and for other dedicated funds held by the bar.

(4) Use local bar associations to screen complaints. Voluntary action at the local level clearly should be encouraged, but numerous speakers at our hearing on this matter, including members of various local bar associations, the National Organization of Bar Counsel, and Professor Sims, stressed the need for a professional disciplinary system in order to handle complaints against attorneys, and the inadequacy of relying on a volunteer system. Reliance on the local bars may provide some supplemental assistance, but would not afford adequate protection for the public.

(5) As to staffing the enforcement unit and preparing responses to petitions filed in this court, the Governor first suggested that volunteers could be used to answer petitions. This function presently is carried out by the Office of General Counsel. The use of volunteers would provide less consistent services to the court and require it to increase its oversight of petitions to a level far greater than presently exercised.

As to enforcement, the Governor suggested that "the Court could simply process the more egregious claims." This would place the court squarely in the business of investigating complaints in order to make the initial determination of which claims merit additional processing. Doing so would be far from simple.

(6) As to who would handle these claims, the Governor offered as a recommendation that the court "place on its payroll those members of the State Bar's staff which would administer the Court's regulation of the disciplinary system." It is suggested that these individuals could

As we conclude, each of these proposed options presents substantial practical problems, and most would result in the court's having to redirect the use of legislatively created resources. We already have explained the critical importance of having a bar disciplinary system and why leaving complaints to the existing civil and criminal litigation system will not provide the necessary protection for the public. Similarly, it has been explained why transferring the disciplinary system to the AOC, as suggested by Senator Kopp and Professor Barnett, is inappropriate.

In sum, none of the alternatives presented offers a method of fulfilling our goal of protecting the public and using the least intrusive approach to do so. To the extent the various alternatives contemplate that this court (i) would commandeer funds collected by the bar pursuant to statutory authorization and utilize them directly to support a disciplinary system, (ii) would expend money from its own appropriated budget to support a disciplinary system, (iii) would appropriate the entire State Bar structure and its existing personnel to the court's own devices, or (iv) would start a discipline system from scratch or by using selected parts of the existing system, they all suffer from the same defect: they would require the court to take action that would upset the status quo under which the bar disciplinary system now functions (to the extent possible, given its limited resources) pursuant to an existing and complete statutory structure. We conclude that none of the alternatives suggested would adequately preserve the status quo and allow the bar to resume at an early date its role of providing a functioning disciplinary system effective in protecting the public.

## IV

 As we have explained, given the present circumstances, our imposition of a fee upon practicing attorneys in order to fund a disciplinary

---

be transferred back to a reformed State Bar, once established. Resources to carry out this option again pose a problem: the Supreme Court has no funding to provide salaries and benefits for an attorney disciplinary staff, and transferring funds to the bar that the Legislature has designated for other purposes potentially would amount to a far more substantial invasion into the legislative function. Moreover, the burden imposed by this temporary solution would greatly disrupt the court's regular work.

(7) The court could maintain the roll of those admitted to the practice of law. As observed by the Governor in his response, this court maintained the roll until the adoption of California Rules of Court, rule 950.5, in 1996. Although the court formerly maintained the physical roll of attorneys, keeping the roll up-to-date, taking changes of address, entering information on the status of attorneys, and the like, were functions performed by State Bar personnel even before 1996.

(8) The court could limit the functions it would oversee, excluding some that the bar wishes to include in the court's definition of a disciplinary system. We discuss hereafter the specifics of the bar's request.

system for attorneys not only is within our power, but also is necessary to fulfill our fundamental responsibilities concerning the regulation of the practice of law in our state. We note that California attorneys have been required to pay a fee for attorney discipline from the inception of the State Bar in 1927, but that because of the impasse relating to aspects of the State Bar's operations other than discipline, California attorneys have been required to pay only a relatively minimal fee this year.

Our inquiry does not end here, however. The amount of the supplemental fee, the mechanism by which such a fee should be imposed, and the restrictions and oversight that the court should place on the expenditure of the money collected also must be determined.

In considering how to proceed, we are guided by certain general policies. First, any fee imposed by the court shall be used solely for the purpose of supporting disciplinary activities. Second, our action is intended to be temporary in nature and to provide continuity in the discipline system until such time as legislation is enacted that provides for the funding of an effective disciplinary system. Third, our action should recognize that the statutes creating the existing State Bar disciplinary system remain in full force and effect; none of the provisions affecting the system's structure or operations has been repealed. Fourth, we shall utilize the least intrusive approach in order to best preserve the status quo so that future legislation can be based upon the existing system rather than upon a hastily created hybrid or completely unprecedented structure. Fifth, although we have been urged by various parties to assume the direct supervision of the bar, the Supreme Court has neither the resources nor the present expertise to do so in an effective and efficient fashion.

A. *Disciplinary Functions to Be Funded by Special Regulatory Fee*

We turn now to the specific fee assessment sought by the bar.

The bar requests an order requiring active members of the bar to pay an additional fee of $171.44. When the $27 already authorized by statute is added, that amounts to 65 percent of the bar's annual budgeted expenses for specified discipline-related services as calculated prior to June 28, 1998, the day of the layoffs. The bar states that this figure is based upon a 12-month budget, but acknowledges that this amount would have to be used through 1999, if no other relief is afforded by legislative action before that time.[24]

---

[24]The brief filed by Anthony T. Caso on behalf of Raymond Brosterhous suggests that the request to collect dues of $171 is for the last two

The bar lists six components of its request for fees:

| | |
|---|---|
| Chief Trial Counsel: Intake and Enforcement | $196.27 |
| State Bar Court | 51.09 |
| Fee Arbitration | 4.63 |
| Competence (rules of professional conduct and ethics hotline) | 15.86 |
| Membership Records | 13.30 |
| General Counsel (Support of Discipline) | 9.60 |
| **Total** | $290.75 |
| **less $27** | $263.75 |
| **Requested Assessment** (balance × 65%) | $171.44 |

The bar's brief contains copies of the proposed budget submitted to the Legislature and to this court in the bar's earlier request. If the $171.44 were the total fee imposed next year from any source in addition to the existing $77 of assessments already mandated, the total fee would be $248.44— approximately $198 of which would be available for discipline, with the balance required by statute to be used for the Client Security Fund and Building Fund. As a comparison, the fee amounts that would have been imposed on attorneys in 1998 and 1999 under Senate Bill No. 1145 (1997-1998 Reg. Sess.), the bill vetoed by Governor Wilson, would have totalled $458 per year, including a special $110 disciplinary assessment. Assembly-member Morrow's bill, Assembly Bill No. 1798, introduced during the last session, would have imposed annual fees of $358 per year. Senator Kopp's bill, Senate Bill No. 1371, also introduced last year, would have vested in the Supreme Court all powers and duties relating to admission, discipline, mandatory continuing legal education, and the Client Security Fund now vested in the Board of Governors of the State Bar. The related costs would have been made part of the Supreme Court budget, and the Bureau of State Audits would "determine the costs of those disciplinary functions and would provide for reimbursement of the Supreme Court for those costs from funds derived from licensing fees." We are unaware of any seriously considered proposal that would have resulted in fees as low as the amount now requested by the State Bar—although the fees sought are not intended to cover the entire range of the bar's existing activities.

months of 1998 and thus, on an annualized basis, equals dues in the amount of $1,103, far more than ever has been authorized by the Legislature. As to the use of this money in 1999, Caso characterizes this part of the request as an attempt to preempt future legislative action.

The bar does not suggest that the $171 is for the final two months of this year, or that the additional fees that will be sought pursuant to legislative authority next year would be sought without regard to the collection of this amount. We emphasize that the relief to be granted by this court is interim in nature and intended to be complementary to the legislative process.

In considering the bar's requested amount, two initial observations are pertinent. First, attorneys have paid a total of only $77 for all bar functions for the entire current year. The money requested is an assessment on attorneys, not moneys sought from the General Fund or another general revenue source. Second, given the already accrued backlog and the start-up efforts that will be necessary, the fee that the court imposes should be in an amount that will make a positive difference, rather than compound the current difficulties.[25]

We turn now to consider the components of the bar's request. The Office of Chief Trial Counsel and the State Bar Court are self-evident parts of the discipline system. Fee arbitration may not appear immediately to be an integral function, but funding this activity will have a direct bearing on future costs of the bar's disciplinary operations. There are local programs in 41 counties participating in the State Bar's fee arbitration program. Of almost 7,000 annual calls to the State Bar's Arbitration Program, almost half were handled through the network of local bars or the State Bar's program, or were resolved before filing. Most complaints come to the program independently of the Office of Trial Counsel's Intake Unit, and the availability of this service almost certainly prevents the filing of additional disciplinary complaints. A substantial backlog of cases already has grown; maintaining a program that will decrease the number of additional complaints will assist the disciplinary system in processing those cases that cannot otherwise be handled. Although it may be argued that the arbitration program is not necessarily an indispensable part of an attorney disciplinary process, it is a valuable and justifiable component of a comprehensive disciplinary system.

"Competence" includes the promulgation of rules of professional conduct and staffing for the "ethics hotline," which responds to calls from members of the bar. The ethics hotline provides information that assists practicing attorneys in performing ethically and in avoiding violations. The letter submitted by Ellen Peck, former State Bar Court judge, states that of the more than 1,000 attorneys over whose cases she presided as a judge, she cannot recall any who had sought assistance from the hotline. In her view, this service is a vitally important prophylactic tool that avoids disciplinary problems for many practitioners. The costs associated with promulgating rules also appear to be a legitimate component of a comprehensive disciplinary system. The ethics hotline, although not immediately apparent as an essential element of a disciplinary system, on closer examination plays an

---

[25]The submission from Senator Kopp and Professor Barnett, while otherwise critical of the State Bar, concluded that a $171 assessment is warranted. As previously stated, the Governor also acknowledged at our hearing that $27 is insufficient to support the disciplinary function.

important role. Like the arbitration programs, the availability of this tool will save costs to the overall system and reduce delay in the processing of cases by avoiding the filing of additional complaints.

The bar maintains membership records and, as a practical matter, has done so for many years, although the formal transfer of this responsibility from the Supreme Court to the bar did not take place until approximately two years ago. The bar's Membership Records Office bills and collects fees, costs, and penalties imposed on licensed attorneys, including reimbursements to the Client Security Fund and disciplinary costs. It also keeps track of all members of the bar, including any record of discipline, and answers inquiries from courts, other governmental agencies, other states, and the public. Accurate records are integral to a meaningful licensing and disciplinary system. We consider the fees requested for this service to be an appropriate disciplinary expenditure.

The Office of General Counsel files pleadings and responds to petitions filed in the Supreme Court. It serves as in-house counsel to the bar. To the extent it serves as counsel for the Office of the Chief Trial Counsel and other component parts of the bar structure (such as the Committee of Bar Examiners) in proceedings relating to admissions and discipline before this court, this function appears to be an integral part of the bar's disciplinary system.

The figure requested by the State Bar is, according to its submission, set at 65 percent of its budgeted needs for the specified functions. Given the information available, and in light of the figures that were discussed during this year's legislative session, the amount requested presumptively appears reasonably calculated to provide at least minimally adequate support for the disciplinary functions normally carried out by the State Bar of California and the State Bar Court. We shall presume that the six functions should be funded in the amounts requested, subject to evaluation by the special master (whose appointment and functions are described below)—who may recommend to the court that it reconsider the allocation of the fees collected.

B. *Imposition of a Fee and Oversight of Expenditures*

In order to levy a fee on attorneys adequate to support the disciplinary system, the court today adopts a rule requiring attorneys in active practice to remit $173, in addition to the $77 presently authorized by statute, to support the disciplinary system. (A copy of the order adopting the rule appears in an appendix to this opinion.) Of the $173, the amount of $171.44 is for the purposes requested by the bar, subject to reallocation by the court upon recommendation of the special master should that be deemed appropriate to

best support the disciplinary system. The remaining $1.56 is imposed in order to pay for the fees and expenses related to the special master and his activities. (Cf. § 6140.9 [imposing a fee of $2 per active member per year to pay for the discipline monitor, and, after expiration of the relevant contract, to be applied to fund disciplinary services].) Payment of the $173 assessed by the court shall be made by separate check to a special fund as designated by the court. Instructions for the payment of this assessment will be included in the State Bar's membership statement for 1999, but the money received will be kept in an account created by the Supreme Court entitled the "Special Master's Attorney Discipline Fund" and maintained separately from money collected by the bar pursuant to its statutory authority or through voluntary payments by members of the bar.[26]

In recognition of the extraordinary circumstances with which we are faced, the court, pursuant to its inherent power over attorney discipline, appoints as a special master retired Justice Elwood Lui to act on its behalf in overseeing the collection and disbursement to the State Bar of the fees imposed under our newly adopted rule.[27] The role of the special master will be to ensure that the funds collected pursuant to the newly adopted rule and disbursed to the bar are used for the limited purpose of supporting the discipline functions as described. The State Bar shall continue to have responsibility for the day-to-day management and operation of the disciplinary system. The special master may evaluate these functions and the expenditures related thereto, and recommend to the court that it reallocate funds or otherwise reconsider their use.

---

[26]If the Legislature adopts and implements a fee bill during 1999, any unexpended amounts collected pursuant to the rule may be dedicated to disciplinary purposes. If the Legislature does not adopt and implement a fee bill during 1999, any unexpended amounts may be transferred for the support of the disciplinary system or credited against the following year's fees, as directed by the court. The payment of all fees, expenses, and costs related to the special master's services shall be made only pursuant to an order of this court.

[27]See appendix. Justice Lui is a certified public accountant; served on the Court of Appeal, Second Appellate District, and on the superior and municipal courts in Los Angeles County; has served as a special master in state and federal court in complex cases involving accounting, financial, and tax questions; has acted at the request of Governor Wilson to mediate difficult public agency labor controversies and served on the Governor's Independent Panel on Redistricting; at the request of the Los Angeles County Board of Supervisors, he undertook temporarily the management of the Los Angeles County Department of Children and Family Services; served as a member of the Commission on the Future of the Legal Profession and the State Bar; is a past president of the California Judges Association; and co-authored the California Judicial Retirement Handbook. He has served as an adjunct professor of accounting and business law at the University of Southern California, and has served on the board of directors of numerous public service organizations, participated in a wide range of public activities, and taught judges, lawyers, and others in diverse areas of the law. In short, he brings to the role of special master an in-depth background in the law, accounting, public service, and complex dispute resolution.

In order to fulfill his duties, the special master may request reports from the bar and may require audits of the bar's expenditures relating to its disciplinary services. In disbursing funds to the bar, the special master shall provide that they may be used only for the support of the discipline-related functions described above, and shall be guided by the existing statutory duties and structure relating to the bar's disciplinary system and the need to provide resources to assist the bar in complying with these provisions. The special master shall report to this court regularly, and no less frequently than every three months, on collections and disbursements made pursuant to the rule we adopt today. He at any time may request further guidance from or make recommendations to the court as he determines is appropriate.

## V

Our action today is intended to respond to an unprecedented emergency threatening the protection of the public, the integrity of the legal profession, and the interests of the courts. In short, the administration of justice is at risk. As we indicated during earlier stages of the dispute among the Governor, the Legislature, and the bar, we urge that a reasonable and speedy resolution of the disagreements impeding the bar from fulfilling its traditional role in the area of attorney discipline be reached among the concerned parties. In the interim, pending such resolution, the court will exercise its inherent authority over attorney discipline by adopting the accompanying interim rule.

The rule that we adopt today, and our concurrent appointment of a special master to oversee the collection and disbursement of funds pursuant to that rule, are actions designed to preserve the status quo pending the enactment and effective date of legislation providing for an attorney discipline system capable of providing meaningful public protection. California has had ample reason during the past 10 years to take pride in an attorney discipline system that has been recognized as one of our nation's finest. We anticipate that in the near future, it will again return to normal operation with appropriate funding as determined by the Legislature and the Governor. Until that occurs, we shall shoulder our responsibility to ensure continuity in attorney discipline in order to best serve the people of our state.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

APPENDIX

ORDER

Rule 963 of the California Rules of Court, regarding an interim special regulatory fee for attorney discipline, is hereby adopted, to become effective immediately, as set forth in the attachment hereto.

Pursuant to this court's inherent authority over attorney discipline and rule 963(c), retired Justice Elwood Lui is hereby appointed as special master to supervise and oversee the collection, disbursement, and allocation of fees mandated by rule 963. The special master shall ensure that funds collected pursuant to rule 963 are used exclusively for the purpose of maintaining and operating an attorney disciplinary system. It is contemplated that these funds will be used to support the State Bar's Office of Chief Trial Counsel, the State Bar Court, the bar's fee arbitration program, the bar's competence functions including the promulgation of rules of professional conduct and the ethics hotline, the bar's membership records office, and the Office of General Counsel as necessary to support the State Bar's disciplinary functions. The special master may evaluate these components of the bar's disciplinary function and related expenditures, and recommend to the court that funds generated by rule 963 be allocated among these or other components in a particular manner.

Fees collected pursuant to rule 963 shall be segregated from all other fees and revenue collected by the State Bar, and deposited into a separate account or accounts at a financial institution as determined by the special master and approved by this court. The special master shall manage the funds generated pursuant to rule 963, before their disbursement, as he deems appropriate. The special master and the Clerk/Administrator of the California Supreme Court each shall have authority to make disbursements from such account(s) for the limited purposes described herein. In managing and disbursing these funds, the special master shall act as an agent of this court. The special master shall be paid the fees and expenses incurred in performing the duties described herein only upon the prior order of this court.

The special master may request that the bar provide him with information and reports as necessary, and may require audits of the bar's expenditures related to its disciplinary functions. The special master shall report to the court regularly, and no less frequently than every three months, on collections and disbursements made pursuant to rule 963. He at any time may

request further guidance from or make recommendations to the court as he determines is appropriate.

This order is final forthwith.

### Rule 963. Interim Special Regulatory Fee for Attorney Discipline

**(a)** This rule is adopted by the Supreme Court solely as an emergency interim measure to protect the public, the courts, and the legal profession from the harm caused by the absence of an adequately functioning attorney disciplinary system. The Supreme Court contemplates that the rule may be modified or repealed once legislation designed to fund an adequate attorney disciplinary system is enacted and becomes effective.

**(b)** Each active member shall pay a mandatory regulatory fee of one hundred seventy-three dollars ($173) to the Special Master's Attorney Discipline Fund, to be established by a special master appointed pursuant to subdivision (c). This $173 assessment is in addition to the mandatory fees currently authorized by statute.

Payment of this fee is due by February 1, 1999. Late payment or nonpayment of the fee shall subject a member to the same penalties and/or sanctions applicable to mandatory fees authorized by statute.

**(c)** All money collected pursuant to this rule shall be deposited into the Special Master's Attorney Discipline Fund, and shall be used exclusively for the purpose of maintaining and operating an attorney disciplinary system, including payment of the reasonable fees, costs and expenses of a special master as ordered by the Supreme Court.

A special master appointed by the Supreme Court shall disburse and allocate funds from the Special Master's Attorney Discipline Fund for the limited purpose of supporting an attorney discipline system. The special master shall exercise authority pursuant to the charge of the Supreme Court and shall submit quarterly reports and recommendations to the Supreme Court regarding the use of these funds.

Should any funds collected pursuant to this rule not be used for the limited purpose set forth in the rule, the Supreme Court may order the refund of an appropriate amount to members or take any other action that it deems appropriate.