[No. S078828. Apr. 5, 2001.]

CARMEL VALLEY FIRE PROTECTION DISTRICT et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

COUNSEL

Law Offices of William D. Ross, William D. Ross and Carol B. Sherman for Plaintiffs and Appellants.

Lloyd W. Pellman, County Counsel (Los Angeles) and Stephen R. Morris, Principal Deputy County Counsel, for Los Angeles County Consolidated Fire Protection District as Amicus Curiae on behalf of Plaintiffs and Appellants.

Daniel E. Lungren and Bill Lockyer, Attorneys General, Manuel M. Medeiros, Linda A. Cabatic and Allen Sumner, Assistant Attorneys General, Paul H. Dobson, Andrea Lynn Hoch, Marsha A. Bedwell and Daniel G. Stone, Deputy Attorneys General, for Defendants and Respondents State of California, Departments of Finance and Industrial Relations, State Controller Kathleen Connell and State Treasurer Philip N. Angelides.

Camille Shelton for Defendant and Respondent Commission on State Mandates.

OPINION

GEORGE, C. J.—In this case we consider whether Government Code section 17581 and certain budget measures that suspend the operation of administrative regulations adopted by the Department of Industrial Relations violate the separation of powers clause of the California Constitution by encroaching on the power of the executive branch of government. (Cal. Const., art. III, § 3.) We conclude that no separation of powers violation has been demonstrated.

I

Executive orders promulgated in 1978 by the Department of Industrial Relations require employers to provide certain items of protective clothing and equipment to employees assigned to firefighting duties. (Cal. Code Regs., tit. 8, §§ 3401-3409, formerly 8 Cal. Admin. Code, §§ 3401-3409.)

Carmel Valley Fire Protection District and other local fire protection agencies incurred expenses complying with this order and, in earlier proceedings, submitted a claim for reimbursement of state-mandated expenditures pursuant to California Constitution, article XIII B, section 6. In 1987, the districts prevailed in securing reimbursement for these state-mandated expenditures. (*Carmel Valley Fire Protection Dist. v. State of California* (1987) 190 Cal.App.3d 521 [234 Cal.Rptr. 795] (*Carmel I*).)

In ensuing years, the state experienced severe fiscal difficulties and undertook various measures to reduce its expenditures. (See Governor's Budget Summary 1992-1993 (Jan. 9, 1992), State and Local Fiscal Relationship, p. 132.) In 1990, the Legislature enacted Government Code section 17581. That provision permits the Legislature to suspend the operation of statutes and executive orders that constitute state-mandated local programs from year to year and to withdraw funding therefor. The Legislature provided in the Budget Act of 1992 that 45 mandates, including the above regulatory requirements regarding protective gear for firefighters, would be suspended pursuant to section 17581 and that no funds would be forthcoming for reimbursement. Of these suspensions, the great majority were of statutory mandates, and only three (including the one presently before us) were regulatory suspensions. (Stats. 1992, ch. 587, item 8885-101-001, provision 4, including items (l), (m), (vv), pp. 2604-2609.) Ensuing budget acts contained the same suspension of the regulatory mandate at issue in the present case, as well as suspension of numerous predominantly statutory mandates. (See Stats. 1993, ch. 55, item 8885-101-001, provision 4, item (uu), pp. 763-768 [43 mandates suspended]; Stats. 1994, ch. 139, item 885-101-001, provision 4, item (w), pp. 1213-1217 [26 mandates suspended].)[1]

On September 5, 1995, the Carmel Valley Fire Protection District, joined by the Alpine Fire Protection District, the Bonita-Sunnyside Fire Protection District, the City of Glendale, the City of Anaheim, the Ventura County Fire Protection District, the San Ramon Valley Fire Protection District, the American Canyon Fire Protection District (a subsidiary district of the City of American Canyon), the Salida Fire Protection District, the West Stanislaus Fire Protection District, the Sacramento County Fire Protection District, the Humboldt No. 1 Fire Protection District, the Samoa-Peninsula Fire Protection District, and the Mammoth Lakes Fire Protection District (collectively referred to as the districts) filed with the Commission on State Mandates (the Commission) a consolidated claim for reimbursement of the expenses they had incurred in supplying their employees with the protective gear noted in the regulations. On June 27, 1996, the Commission rejected the consolidated claim, relying upon Government Code section 17581 and the budget language that deleted funding for this expense.

On October 8, 1996, the districts filed a petition for writ of mandate and complaint for declaratory relief against the State of California, the Commission, the State Department of Finance, the State Department of Industrial Relations, the State Controller, and the State Treasurer, seeking an order that

---

[1]The suspension has continued in effect through the 2000-2001 fiscal year. (See, e.g., Stats. 2000, ch. 52, item 8350-295-0001, provision 3, item (b).)

their claims for expenditures from 1992, 1993, and 1994 be paid from specified existing appropriations. Among other contentions, the districts claimed that Government Code section 17581 and the budget language suspending the mandate for firefighters' equipment violated the separation of powers clause of the California Constitution (Cal. Const., art. III, § 3) by purporting to permit the Legislature to veto executive action.

On April 30, 1997, the trial court denied the petition for writ of mandate and dismissed the declaratory relief action. It declared: "Government Code section 17581 having been satisfied, the mandate of California Code of Regulations Title 8, sections 3401-3409, requiring that petitioners provide their employees with specified equipment and clothing, was suspended by operation of the Budget Acts of 1992, 1993 and 1994, thereby making the provision of such equipment and clothing optional on the part of petitioners."

The trial court also concluded that the Legislature had not "usurp[ed] . . . executive functions" in violation of the separation of powers clause of the California Constitution.

The districts appealed. As in the trial court, they challenged the suspension of the administrative mandate on several grounds, including the claim that the suspension violated the separation of powers clause of the California Constitution. The Court of Appeal reversed the judgment of the trial court, determining that Government Code section 17581, as applied to the districts, constituted a violation of the constitutional separation of powers provision. Because the appellate court reached this conclusion, it did not address the districts' other claims, including a claimed violation of the single-subject rule of the California Constitution. (Cal. Const, art. IV, § 9.)

We granted respondents' petition for review challenging the conclusion of the Court of Appeal with respect to the claimed violation of the separation of powers clause of the state Constitution.

## II

### A

To begin our analysis, we describe the statutory background of the administrative orders at issue in the present case, and note the conflict that has occurred over the provision of funding to carry out these orders.[2]

In 1973, the Legislature enacted the California Occupational Safety and Health Act (Cal/OSHA). (Lab. Code, § 6300 et seq.) The purpose of the act

---

[2]We grant the districts' request that we take judicial notice of portions of the state budget acts enacted in 1997 and 1998. (Evid. Code, § 451, subd. (a).) We also grant the state's

is to ensure "safe and healthful working conditions for all California working men and women by authorizing the enforcement of effective standards, [and] assisting and encouraging employers to maintain safe and healthful working conditions . . . ." (Lab. Code, § 6300.) The Occupational Safety and Health Standards Board within the Department of Industrial Relations is responsible for adopting occupational safety and health standards and orders. (Lab. Code, §§ 140, 142.3, 6305.) It is pursuant to this authority that the executive orders here at issue, relating to protective equipment, were adopted in 1978.

Article XIII B, section 6 of the California Constitution provides, with exceptions not applicable here, that "[w]henever the Legislature or any state agency mandates a new program or higher level of service on any local government, the State shall provide a subvention of funds to reimburse such local government for the costs of such program or increased level of service . . . ."[3]

Despite existing statutory provisions requiring reimbursement of expenditures for state-mandated local programs, however, the Legislature when it adopted Cal/OSHA also enacted uncodified measures stating that the costs of compliance with regulations imposed pursuant to Cal/OSHA were not subject to reimbursement, on the theory that the costs were minimal and that Cal/OSHA merely restated a federal mandate. (Stats. 1973, ch. 993, § 106, p. 1954; Stats. 1974, ch. 1284, § 36, p. 2787.) In later years, the Legislature appended control language to budget items appropriating funds for reimbursement of state mandates, stating with particularity that no application for reimbursement of the cost of compliance with the Cal/OSHA regulations (Cal. Code Regs., tit. 8, §§ 3401-3409) regarding protective gear for firefighters would be processed. (See, e.g., Stats. 1981, ch. 1090, § 3, p. 4193.)

In 1987, in *Carmel I, supra,* 190 Cal.App.3d 521, the Court of Appeal examined this uncodified language in light of the districts' claim for reimbursement for expenses of firefighters' safety equipment. The appellate court rejected as unfounded the Legislature's declaration that it need not provide reimbursement for expenditures required by Cal/OSHA because Cal/OSHA simply restated a federal mandate. That court concluded that pursuant to

request that we take judicial notice of portions of the Governor's budget summaries from fiscal year 1992-1993 to fiscal year 1999-2000. (Evid. Code, § 452, subd. (c).)

[3]This constitutional provision was adopted in 1979; similar reimbursement requirements previously were imposed by statute. (See former Rev. & Tax. Code, § 2231, subd. (a), added by Stats. 1975, ch. 486, § 7, p. 999; see also former Rev. & Tax. Code, § 2207, added by Stats. 1975, ch. 486, § 1.8, pp. 997-998; former Rev. & Tax. Code, § 2164.3, subd. (a), as added by Stats. 1972, ch. 1406, § 14.7, p. 2962, amended by Stats. 1973, ch. 208, § 51, p. 564.)

article XIII B, section 6 of the California Constitution, expenses incurred to comply with the 1978 regulations at issue in the present case were state-mandated local expenses and that the districts were entitled to reimbursement.

The Court of Appeal also declared that the budget control language was invalid because it violated the state constitutional requirement that a bill have only a single subject. (Cal. Const., art. IV, § 9.) The appellate court explained that the statement that no application would be *processed* for reimbursement of expenses incurred to comply with Cal/OSHA orders was unrelated to the ostensible subject of the bill—appropriations for reimbursement of state-mandated local programs. (*Carmel I, supra,* 190 Cal.App.3d at pp. 541-545.) That court declared that nothing in the bill "alert[s] the reader to the fact that the bill prohibits the Board [of Control] from entertaining claims pursuant to the Cal/OSHA executive orders. The control language does not modify or repeal these orders, nor does it abrogate the necessity for County's continuing compliance therewith. It simply places County's claims reimbursement process in limbo." (*Id.* at p. 545.)

Apparently at least in part in response to this decision, in 1990 the Legislature enacted Government Code section 17581, which provides in pertinent part: "(a) No local agency shall be required to implement or give effect to any statute or executive order, or portion thereof, during any fiscal year . . . if all of the following apply: [¶] (1) The statute or executive order, or portion thereof, has been determined by the Legislature, the commission [on state mandates], or any court to mandate a new program or higher level of service requiring reimbursement of local agencies pursuant to Section 6 of Article XIII B of the California Constitution. [¶] (2) The statute or executive order, or portion thereof, has been specifically identified by the Legislature in the Budget Act for the fiscal year as being one for which reimbursement is not provided for that fiscal year." Section 17581 also provides that if an agency nonetheless elects to implement such a statute or order, it may assess special fees upon persons or entities benefiting from the implementation. (Gov. Code, § 17581, subd. (b).)

As noted, in the Budget Acts of 1992, 1993, and 1994, the administrative regulations requiring protective gear for firefighters were identified in the manner noted by Government Code section 17581, and the districts' request for reimbursement for the expenses of compliance was refused.

B

Next, we review the parties' contentions and the reasoning of the Court of Appeal. The districts contend that Government Code section 17581 and the

provisions of the Budget Acts of 1992, 1993, and 1994 suspending the administrative regulations here at issue represent an effort by the Legislature to invade the power of the executive branch to carry out its duties under Cal/OSHA, thereby violating the constitutional principle of separation of powers. The districts claim that the Legislature delegated broad authority to the Department of Industrial Relations to enact and enforce regulations to carry out the department's mandate to ensure worker safety, and that the Legislature violated the principle of separation of powers when it purported to retain supervisorial control over the manner in which the department executes its duties. The districts conclude that the Legislature usurped the executive power of the department by exempting local agencies from the administrative regulations rather than altering or revoking the department's statutory power over rulemaking and enforcement.

Agreeing with the position of the districts, the Court of Appeal declared that Government Code section 17581 represents an unwarranted intrusion into the operation of the executive branch: "By reason of the separation of powers doctrine, the Legislature's power to declare public policy does not include the power to carry out its declared policies." In the view of the Court of Appeal, the Legislature could not retain supervisorial power or veto power over the execution of Cal/OSHA, in the absence of a statute amending or revoking the delegation of executive power over Cal/OSHA, or at least a statute effecting an implied repeal of the Department of Industrial Relations' executive orders. The Legislature, the Court of Appeal said, lacks "the power to cherry-pick the programs to be suspended—which is precisely what the Legislature has done by suspending the operations of only those [identified in the budget]." According to the appellate court, the enactment of Government Code section 17581, far from constituting a revocation of executive power or an implied repeal, constituted an "attempt[] to exercise an unconstitutional veto power over the [department's] administration of Cal/OSHA."

The Court of Appeal concluded that although the Legislature may choose to retain complete control over a function by itself enacting detailed rules, the Legislature cannot retain administrative control when it enacts a statute that provides "broad policy guidance and leave[s] the details to be filled in by administrative officers exercising substantial discretion." The appellate court declared Government Code section 17581 "constitutionally infirm as applied."

The Attorney General, representing the state, the Department of Industrial Relations, the Department of Finance, the State Controller, and the State Treasurer (collectively referred to for convenience as the State) responds that

the Legislature has not attempted to control the exercise of executive power, but rather has exercised its own power over appropriations and expenditures. It is within the Legislature's power, the State contends, to suspend an executive mandate in the interest of an appropriate allocation of limited state funds. Once the Legislature has enacted a statute suspending a mandate, it is clear that the executive lacks power to enforce regulations inconsistent with that statute. Executive power is not thereby threatened or frustrated, the State concludes, because the executive branch always is dependent upon the Legislature for funds.

### III

We now consider Government Code section 17581 in light of the constitutional provision for separation of powers, and, as we shall explain, conclude that the statutory and budgetary provisions involved in the present case do not violate the separation of powers clause of the California Constitution.

Article III, section 3 of the California Constitution states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution."

The separation of powers doctrine limits the authority of one of the three branches of government to arrogate to itself the core functions of another branch. (*In re Attorney Discipline System* (1998) 19 Cal.4th 582, 596 [79 Cal.Rptr.2d 836, 967 P.2d 49]; *Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 53 [51 Cal.Rptr.2d 837, 913 P.2d 1046] (*Mendocino*); see also *Loving v. United States* (1996) 517 U.S. 748, 757 [116 S.Ct. 1737, 1738-1739, 135 L.Ed.2d 36].) " 'The courts have long recognized that [the] primary purpose [of the separation-of-powers doctrine] is to prevent the combination in the hands of a single person or group of the basic or fundamental powers of government.' " (*Davis v. Municipal Court* (1988) 46 Cal.3d 64, 76 [249 Cal.Rptr. 300, 757 P.2d 11], quoting *Parker v. Riley* (1941) 18 Cal.2d 83, 89-90 [113 P.2d 873, 134 A.L.R. 1405]; see also *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, 509 [53 Cal.Rptr.2d 789, 917 P.2d 628].) To serve this purpose, courts " 'have not hesitated to strike down provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of one or another coordinate Branch.' " (*Kasler v. Lockyer* (2000) 23 Cal.4th 472, 493 [97 Cal.Rptr.2d 334, 2 P.3d 581], quoting *Mistretta v. United States* (1989) 488 U.S. 361, 382 [109 S.Ct. 647, 660, 102 L.Ed.2d 714].)

The doctrine, however, recognizes that the three branches of government are interdependent, and it permits actions of one branch that may "significantly affect those of another branch." (*Mendocino, supra,* 13 Cal.4th at p. 52.) In the context of asserted legislative encroachment on the judicial power, for example, although we have invalidated legislative measures that would defeat or materially impair this court's inherent power (see, e.g., *Hustedt v. Workers' Comp. Appeals Bd.* (1981) 30 Cal.3d 329, 339-341 [178 Cal.Rptr. 801, 636 P.2d 1139] [judicial power to discipline attorneys could not be vested in Workers' Compensation Appeals Board]; see also *People v. Superior Court (Romero), supra,* 13 Cal.4th 497 [construing a statute so as to preserve the essential judicial function of dismissal, free from interference by the executive]), we have rejected separation of powers claims when no material impairment appeared. (See *Mendocino, supra,* 13 Cal.4th 45, 58-60.) With respect to encroachment on the power of the executive, we observed, in rejecting a claim that a statute providing for the expungement of certain criminal records duplicated the Governor's clemency power in some cases and therefore infringed upon the executive power, in violation of the doctrine of separation of powers: "The purpose of the doctrine is to prevent one branch of government from exercising the *complete* power constitutionally vested in another [citation]; it is not intended to prohibit one branch from taking action properly within its sphere that has the *incidental* effect of duplicating a function or procedure delegated to another branch." (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 117 [145 Cal.Rptr. 674, 577 P.2d 1014].)

■ The founders of our republic viewed the legislature as the branch most likely to encroach upon the power of the other branches. (See *Bowsher v. Synar* (1986) 478 U.S. 714, 727 [106 S.Ct. 3181, 3188, 92 L.Ed.2d 583]; *Buckley v. Valeo* (1976) 424 U.S. 1, 129 [96 S.Ct. 612, 687-688, 46 L.Ed.2d 659]; see also Madison, The Federalist No. 48 (Cooke ed. 1961) pp. 332-334.) The principle of separation of powers limits any such tendency. First, it prohibits the legislative branch from arrogating to itself core functions of the executive or judicial branch. (See *Younger v. Superior Court, supra,* 21 Cal.3d at pp. 115-117; see also *Wash. Airports v. Noise Abatement Citizens* (1991) 501 U.S. 252, 274-275 [111 S.Ct. 2298, 2310-2312, 115 L.Ed.2d 236] (*MWAA v. CAAN*).) Second, legislative power also is circumscribed by the requirement that legislative acts be bicamerally enacted and presented to the head of the executive branch for approval or veto. (Cal. Const., art. IV, §§ 1, 8, subd. (b), 10, subd. (a); see *California Radioactive Materials Management Forum v. Department of Health Services* (1993) 15 Cal.App.4th 841, 872 [19 Cal.Rptr.2d 357] (*California Radioactive Materials*); *INS v. Chadha* (1983) 462 U.S. 919, 945-951, 958 [103 S.Ct. 2764, 2781-2784, 2787-2788,

77 L.Ed.2d 317] (*Chadha*); see also *MWAA v. CAAN, supra,* 501 U.S. at p. 275 [111 S.Ct. at pp. 2311-2312].)

■ The core functions of the legislative branch include passing laws, levying taxes, and making appropriations. (Cal. Const., art. IV, §§ 1, 8, subd. (b), 10, 12; *In re Attorney Discipline System, supra,* 19 Cal.4th 582, 595; see also *Butt v. State of California* (1992) 4 Cal.4th 668, 698 [15 Cal.Rptr.2d 480, 842 P.2d 1240].) "Essentials of the legislative function include the determination and formulation of legislative policy." (*State Bd. of Education v. Honig* (1993) 13 Cal.App.4th 720, 750 [16 Cal.Rptr.2d 727].) Further, it is settled that " 'the power to collect and appropriate the revenue of the State is one peculiarly within the discretion of the Legislature.' " (*In re Attorney Discipline System, supra,* 19 Cal.4th 582, 595.) Executive power over appropriations is limited and is set out in the state Constitution, which provides that each year the Governor shall submit a proposed budget to the Legislature (Cal. Const., art. IV, § 12; see *Butt v. State of California, supra,* 4 Cal.4th at p. 698) and that each bill, including the budget bill, shall be presented to the Governor for his or her signature or veto. (Cal. Const., art. IV, § 10.) Legislative determinations relating to expenditures in other respects are binding upon the executive: "The executive branch, in expending public funds, may not disregard legislatively prescribed directives and limits pertaining to the use of such funds." (*Mendocino, supra,* 13 Cal.4th at p. 53.)

■ The legislative branch of government, although it is charged with the formulation of policy, properly may delegate some quasi-legislative or rulemaking authority to administrative agencies. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 142 [93 Cal.Rptr. 234, 481 P.2d 242].) For the most part, delegation of quasi-legislative authority to an administrative agency is not considered an unconstitutional abdication of legislative power. (*Davis v. Municipal Court, supra,* 46 Cal.3d at p. 76; *Bixby v. Pierno, supra,* 4 Cal.3d at p. 142.) " ' "The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made." ' " (*Loving v. United States, supra,* 517 U.S. at pp. 758-759 [116 S.Ct. at p. 1744]; see also 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 130, p. 186.)

■ The Department of Industrial Relations, however, as an executive agency created by statute, has only as much rulemaking power as is invested in it by statute. (See *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, 390-392 [211 Cal.Rptr. 758,

696 P.2d 150]; *State Bd. of Education v. Honig, supra,* 13 Cal.App.4th at pp. 750-752 [" ' "there is no agency discretion to promulgate a regulation which is inconsistent with the governing statute" ' "(italics omitted)]; *Imperial Irrigation Dist. v. State Water Resources Control Bd.* (1990) 225 Cal.App.3d 548, 567 [275 Cal.Rptr. 250] [" '[t]he powers of public [agencies] are derived from the statutes which create them and define their functions' "].) As we have explained, "[a]dministrative action that is not authorized by, or is inconsistent with, acts of the Legislature is void." (*Association for Retarded Citizens v. Department of Developmental Services, supra,* 38 Cal.3d at p. 391.) And, as another court has announced, "the rulemaking authority of an agency is circumscribed by the substantive provisions of the law governing the agency . . . . [R]egulations that alter or amend the statute or enlarge or impair its scope are void." (*Physicians & Surgeons Laboratories, Inc. v. Department of Health Services* (1992) 6 Cal.App.4th 968, 982 [8 Cal.Rptr.2d 565].) An executive agency lacks power, for example, to order the disbursement of funds for a purpose contrary to that stated in a legislative enactment. (*Assembly v. Public Utilities Com.* (1995) 12 Cal.4th 87, 100-104 [48 Cal.Rptr.2d 54, 906 P.2d 1209].)

■ Further, an administrative agency is subject to the legislative power of the purse and "may spend no more money to provide services than the Legislature has appropriated." (*Association for Retarded Citizens v. Department of Developmental Services, supra,* 38 Cal.3d at p. 393.) The power of appropriation includes the power to withhold appropriations. Neither an executive administrative agency nor a court has the power to require the Legislature to appropriate money. (*California State Employees' Assn v. Flournoy* (1973) 32 Cal.App.3d 219, 234-235 [108 Cal.Rptr. 251].) For example, in *California State Employees' Assn. v. Flournoy,* the Court of Appeal rejected a separation of powers claim that, because the Regents of the University of California was the executive agency vested with the power to govern the university, the Legislature lacked authority to refuse to grant the salary increases recommended by the Regents. The court observed that although the Regents possessed broad discretion over governance of the university, a constitutional power that was beyond the control of the Legislature, the " 'finances of the University are subject to legislative scrutiny' . . . . Hence, although . . . the Regents may be granted salary-fixing authority by the state Constitution, there is nothing to suggest that they additionally are granted authority to compel the California Legislature to appropriate money to pay any faculty salary increases which the Regents may have authorized or 'fixed.' " (*Id.* at p. 233.)

■ The decision to relieve districts of the duty to comply with specified executive orders is a policy decision—an act within the authority of the

Legislature, although it incidentally affects the legislatively enacted authority of the Department of Industrial Relations to promulgate regulations. (See *Steiner v. Superior Court* (1996) 50 Cal.App.4th 1771, 1785 [58 Cal.Rptr.2d 668] ["revocation of legislative action is itself legislative"].) The circumstance that the department may have had concurrent authority to alter or rescind the regulations in the present case—within the bounds of its statutory authority—does not suggest that the Legislature lacked authority over the matter. (See *In re Attorney Discipline System, supra,* 19 Cal.4th at pp. 596, 602-603, 611 [the circumstance that the Legislature has authority to impose attorney discipline and fees does not mean that the court cannot]; *Mendocino, supra,* 13 Cal.4th at p. 58 [the Legislature may exert "the authority to establish a schedule providing when the court generally will be open to the public," although a court has " 'inherent power' to control the hours and days of its operations"].)

Considering the appropriate function of the Legislature—to define policy and allocate funds—and considering the inability of an administrative agency to which quasi-legislative power has been delegated to adopt rules inconsistent with the agency's governing statutes, we believe that a legislative enactment that limits the mandate of an administrative agency or withdraws certain of its powers is not necessarily suspect under the doctrine of separation of powers. When the Legislature has not taken over core functions of the executive branch and the Legislature has exercised its authority in accordance with formal procedures set forth in the Constitution, such an enactment normally is consistent with the checks and balances prescribed by our Constitution.[4]

Government Code section 17581 was enacted, of course, by both houses of the Legislature and presented to the Governor for approval, as

---

[4]We need not determine whether *Nixon v. Administrator of General Services* (1977) 433 U.S. 425 [97 S.Ct. 2777, 53 L.Ed.2d 867], cited by the districts, applies to a claim under the state Constitution. *Nixon* directs that under the federal separation of powers doctrine a court first must determine whether legislative action is "unduly disruptive" (*id.* at p. 445 [97 S.Ct. at p. 2791]) and examine the "extent to which [the action] prevents the Executive Branch from accomplishing its constitutionally assigned functions. [Citation.] Only where the potential for disruption is present must [the court] then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." (*Id.* at p. 443 [97 S.Ct. at p. 2790].) We have not adopted such a standard in the past (see *Butt v. State of California, supra,* 4 Cal.4th at p. 702), and in any case, as discussed below, we do not perceive a potential for undue disruption of the Department of Industrial Relations' essential functions, so we need not consider whether, had such disruption been found, we would overlook it in the interest of some "overriding need" for the legislative action. We note, too, that later high court cases do not apply this balancing test, but treat the separation of powers doctrine as a structural requirement that applies whether or not the encroachment appears to carry out an important policy. (*Chadha, supra,* 462 U.S. at pp. 944-946 [103 S.Ct. at pp. 2780-2782]; see also *Bowsher v. Synar, supra,* 478 U.S. at p. 736 [106 S.Ct. at pp. 3192-3193].)

were the budget items at issue in the present case. The adoption of the statutory provision and the budgetary limitations in the present case— measures that suspend operation of executive orders and withhold state reimbursement for certain protective gear no longer mandated by the orders—does not signify that the Legislature has taken over core functions of the executive branch. Although section 17581 and the noted budget items have some impact on the functions of the Department of Industrial Relations, they do not defeat or materially impair the ability of the department to carry out its mandate to protect worker safety: even in the realm of the protection of firefighters, the department retains authority to enforce other, generally applicable regulations and to issue orders intended to ensure firefighter safety. Rather, the effect on the department is incidental, while the statutory and budget measures under review constitute an expression of the Legislature's essential duty to devise a reasonable budget.

It is most significant to the present case that the Legislature is the branch of government that must, on a yearly basis, fit the needs of the state into the funds available. "Enactment of a state budget is a legislative function, involving 'interdependent political, social and economic judgments which cannot be left to individual officers acting in isolation; rather, it is, and indeed must be, the responsibility of the legislative body to weigh those needs and set priorities for the utilization of the limited revenues available.' " (*Anderson v. Superior Court* (1998) 68 Cal.App.4th 1240, 1249 [80 Cal.Rptr.2d 891].) In determining what funds to expend in a given year, the Legislature must consider many legitimate and pressing calls on the state's resources—in addition to the safety of firefighters. (See *California Teachers Assn. v. Ingwerson* (1996) 46 Cal.App.4th 860 [53 Cal.Rptr.2d 917].)

This is not a case in which the legislative action deprives the administrative agency of the resources necessary to carry out its function. The present case is distinguishable, therefore, from *Scott v. Common Council* (1996) 44 Cal.App.4th 684 [52 Cal.Rptr.2d 161], a case cited by the districts. In that case, the Court of Appeal determined that a local legislative body's action in eliminating all funding for the city attorney's investigative staff was beyond the normal appropriation power of that body, because "the budget cuts materially impaired the city attorney in the performance of his prosecutorial duties." (*Id.* at p. 694.) Such is not the case here.

We are unaware of any authority, and the Court of Appeal did not cite any, establishing that the Legislature may not circumscribe the authority of an administrative agency in certain particulars without withdrawing the general delegation of rulemaking authority it has made to the administrative

agency. Such a rule would be cumbersome in the extreme, requiring a major overhaul of administrative function when a minor change might suffice, and impairing the ability of the Legislature to allocate funds on a yearly basis.

Despite the contrary assertion of the Court of Appeal and the districts, the decision in *California Radioactive Materials, supra,* 15 Cal.App.4th 841, does not compel a contrary conclusion. In that case, a committee of the state Senate exacted a promise from persons being considered for confirmation as officers of the Department of Health Services that an application to construct a low-level radioactive waste disposal site would be reconsidered at a hearing conducted pursuant to a formal procedure prescribed by the Administrative Procedure Act (APA), although such a procedure was not required by statute. The Court of Appeal issued a writ of mandate directing the department to set aside its order for further formal administrative hearings, because the legislative action requiring such a hearing had not been undertaken by vote of both houses of the Legislature and presented to the Governor.

In reaching this decision, the Court of Appeal relied in part upon the decision of the United States Supreme Court in *Chadha, supra,* 462 U.S. 919. In that case, pursuant to a statute granting it this power, the United States House of Representatives passed a resolution overturning an administrative decision suspending deportation of a noncitizen. The high court determined that the statute permitting such legislative interference with administrative action constituted a violation of the doctrine of separation of powers, because the statute purported to authorize a legislative act that was not the result of an enactment passed by both houses of Congress and presented to the President for approval or veto. (*Id.* at pp. 944-959 [103 S.Ct. at pp. 2780-2788].) Language in the *Chadha* opinion stressing the independence of the executive branch from legislative interference must be understood in context; the flaw in the legislative act was that Congress failed to enact the measure (overturning the administrative decision) by act of both houses and to present the duly passed enactment to the chief executive for approval or veto.

Relying on *Chadha, supra,* 462 U.S. 919, the Court of Appeal in *California Radioactive Materials* appropriately concluded that "having granted authority to the department to execute the provisions of the Radiation Control Law, the Legislature 'must abide by its delegations of authority until that delegation is legislatively altered or revoked' by statute in accordance with the bicameral and presentment requirements of our Constitution." (*California Radioactive Materials, supra,* 15 Cal.App.4th at p. 872.) Applied to the

present case, this conclusion means only that Government Code section 17581 would be unconstitutional if it permitted a single house of the Legislature to suspend a departmental mandate without concurrence of both houses and presentment to the Governor.

The decision in *California Radioactive Materials* went beyond *Chadha* in asserting that, "[h]aving enacted a statutory scheme, the Legislature has no power to exercise supervisorial control or to retain for itself some sort of 'veto' power over the manner of execution of the laws." (*California Radioactive Materials, supra,* 15 Cal.App.4th at p. 872.) In this respect, the decision overstated the matter—certainly the legislative branch retains control to the extent that both of its houses may pass an enactment, with the approval of the President or the Governor, that does not constitute a material incursion upon the power of the executive. (See *MWAA v. CAAN, supra,* 501 U.S. at pp. 274-276 [111 S.Ct. at pp. 2310-2312].)

In support of the above quoted dictum, the Court of Appeal in *California Radioactive Materials* mistakenly relied upon our decision in *State Board of Education v. Levit* (1959) 52 Cal.2d 441, 461-462 [343 P.2d 8] and the decision of the high court in *Bowsher v. Synar, supra,* 478 U.S. 714, 726-727 [106 S.Ct. 3181, 3187-3188]. In *Levit,* we explained that the California Constitution specifically conferred authority to select school textbooks upon the State Board of Education, and that an established principle directed that when the state Constitution specifically confers power upon an executive officer, the Legislature cannot directly or indirectly remove that power from that officer's control. Under these rules, we readily concluded that the Legislature stepped beyond the constitutional limits of its power when it inserted a restriction into a general budget item appropriating funds for textbooks, prohibiting expenditure for a particular textbook selection made by the State Board of Education. In this instance the executive, by operation of an express *constitutional* provision, had *exclusive* control over textbook, selection. (*Levit, supra,* 52 Cal.2d at pp. 460-464.) The state Constitution, by contrast, does not vest the Department of Industrial Relations with exclusive control over all measures to be employed to ensure worker safety.

The *Bowsher* case involved the Balanced Budget and Emergency Deficit Control Act of 1985 (2 U.S.C. § 901 et seq.), which, when federal deficit spending exceeded a certain limit, required the United States Comptroller General to identify budget reductions that the President was required to carry out. The act vested Congress with the power to remove the Comptroller General from office by joint resolution (or by impeachment). The high court

determined that the doctrine of separation of powers established that Congress may not remove an officer charged with executive duties except by impeachment. Although the Comptroller General served an executive function, under the act Congress retained the power to remove the official from office. The officer thereby became answerable only to Congress, vesting Congress with control of the execution of the laws, in violation of the doctrine of separation of powers. (*Bowsher v. Synar, supra,* 478 U.S. at pp. 722-723 [106 S.Ct. at pp. 3185-3186].) The high court's opinion announced that " 'Congress must abide by its delegation of authority [to an executive officer] until that delegation is legislatively altered or revoked.' " (*Id.* at p. 726 [106 S.Ct. at p. 3188].)

We do not believe that the *Bowsher* decision would prevent Congress from amending the deficit control act to exempt from the Comptroller General's budget reduction authority certain projects favored by Congress. Rather, the decision barred ultimate congressional *control*—through the unilateral power of removal—over *any* executive exercise of the discretion actually vested in that official by the statute. The case stands for the proposition that Congress may limit the discretion vested in the executive by enacting a statute circumscribing that discretion, but it may not control the *exercise* of the discretion actually vested by statute in the executive by retaining the unilateral power of removal. ■ Similarly, if we were to apply the *Bowsher* decision in the present context, it might cast doubt on the California Legislature's authority to enact a statute vesting the legislative branch with the unilateral power to remove the Director of the Department of Industrial Relations from office by joint resolution, but it would not cast doubt on the power of the Legislature to enact a statute limiting the scope of the discretion vested in the director—as long as the limitation did not defeat or materially impair the exercise of executive power.[5]

■ The districts claim that in cases similar to this one, the United States Supreme Court has rejected legislative incursions into the power vested in administrative agencies as inconsistent with the doctrine of separation of powers, and they urge this court to follow suit. We do not believe, however, that the cited decisions would direct that we disapprove Government Code section 17581—putting aside the question whether, in interpreting our own state Constitution's separation of powers clause, we are bound to adopt the reasoning of the high court. It is true that the high court rejected certain legislative veto provisions in *Chadha, supra,* 462 U.S. 919, and other cases because they unconstitutionally interfered with the authority of the

---

[5]*California Radioactive Materials Management Forum v. Department of Health Services, supra,* 15 Cal.App.4th 841, is disapproved to the extent it is inconsistent with this opinion.

executive branch. As noted, however, *Chadha* was concerned primarily with the formal requirements of bicameral enactment and presentment to the chief executive, and these requirements have been met in the present case. As explained, the present case is not like *Bowsher v. Synar, supra,* 478 U.S. 714, nor is it comparable to *MWAA v. CAAN, supra,* 501 U.S. 252, in which Congress created an administrative agency over which it maintained absolute control because members of Congress constituted a majority of the agency's executive board. In that case the legislative branch retained *absolute* control over an executive function, while in the present case the Department of Industrial Relations retains administrative control subject to *incidental* legislative restriction that is wholly consistent with the exercise of the legislative power over appropriations.

Contrary to the claim of the districts, the United States Supreme Court has acknowledged that Congress generally may control executive administrative action by *enacting an appropriate statute* circumscribing the authority of the agency. (*Chadha, supra,* 462 U.S. at pp. 954-955 & fn. 19 [103 S.Ct. at pp. 2785-2786]; *Bowsher v. Synar, supra,* 478 U.S. at pp. 733-734 [106 S.Ct. at pp. 3191-3192].) Courts in other jurisdictions also acknowledge that the Legislature retains this power. (See *Mo. Coalition v. Joint Com. on Admin.* (Mo. 1997) 948 S.W.2d 125, 134 ["It [the legislature] may . . . attempt to control the executive branch by passing amendatory or supplemental legislation and presenting such legislation to the governor for signature or veto, or, by the power of appropriation"]; *Matter of State Health Plan* (1994) 135 N.J. 24 [637 A.2d 1246, 1248] ["Thus, if the Legislature concludes that an administrative regulation exceeds the agency's delegated authority or is contrary to public policy, it may adopt legislation that overrides the regulation"].) The Ninth Circuit United States Court of Appeals, for example, rejected a separation of powers claim against a federal enactment exempting a certain development project from ongoing administrative scrutiny under the Environmental Protection Act and the National Historic Preservation Act. Declining to rely upon *Chadha, supra,* 462 U.S. 919, and citing *Bowsher v. Synar, supra,* 478 U.S. 714, in support, the circuit court stated that "Congress 'essentially assumed the role the [agency] would ordinarily have played and made a selection' " among various possible administrative determinations. (*Apache Survival Coalition v. U.S.* (9th Cir. 1994) 21 F.3d 895, 900.) Far from "arrogat[ing] the powers reserved to the Executive Branch," the court stated, the enactment did "not usurp the [agency's] authority to decide if the [administrative] requirements . . . have been met; rather, it exempts the Project from those requirements . . . . [¶] . . . There has been no usurpation of the Executive's power; instead, Congress has changed the scope of the Executive's duties." (*Id.,* at pp. 904-905.)

Even cases holding that certain legislative veto provisions violate the doctrine of separation of powers nonetheless have recognized that the legislature properly retained certain power to control executive action. For example, in a case summarily affirmed by the United States Supreme Court, the United States Court of Appeals, District of Columbia Circuit, declared that although the Natural Gas Policy Act of 1978 contained an unconstitutional provision for a one-house veto of energy pricing regulations, nonetheless, "[p]resumably, a legislative review mechanism permitting a rule to be repealed by a joint resolution presented to the President would present no constitutional problems. Even though such a device would still differ from enactment of a statute—since the statutory language would remain the same although the specific action was forbidden, and since a veto resolution is easier to adopt than an affirmative bill—the essential elements of the constitutional lawmaking process would participate. There would be neither an increase in total federal power nor a violation of separation of powers." (*Consumer Energy, etc. v. F. E. R. C.* (D.C. Cir. 1982) 673 F.2d 425, 470, summarily affd. *sub nom. Process Gas Consumers Group v. Consumer Energy Council of America* (1983) 463 U.S. 1216 [103 S.Ct. 3556, 77 L.Ed.2d 1402, 1403, 1413].)

We do not find any language in these cases indicating that the legislative branch may not alter the discretion afforded the executive except by withdrawing *entirely* its original delegation of power to the administrative agency. We observe that in an article written shortly after the *Chadha* decision, Justice Stephen Breyer, then a judge on the United States Court of Appeals, First Circuit, suggested that although the *Chadha* decision made questionable the many legislative veto provisions then common in federal enactments, Congress legitimately could achieve the same result by *enacting a statute setting aside the agency action or by cutting the agency's appropriation.* He stated that Congress "can delay implementation of an executive action . . . until Congress has had time to consider it and to enact legislation preventing the action from taking effect . . . . If a significant group of legislators strongly opposes a particular agency decision, it might well succeed in including a sentence in the appropriations bill denying the agency funds to enforce that decision." (Breyer, *The Legislative Veto after Chadha* (1984) 72 Geo. L.J. 785, 792.)

Cases analyzing the problem of the legislative veto also acknowledge, as did Justice Breyer, that the legislative branch legitimately may employ its power of the purse to control executive action. (See *Consumer Energy etc. v. F.E.R.C., supra*, 673 F.2d at p. 474; *Mo. Coalition v. Joint Com. on Admin., supra*, 948 S.W.2d 125, 134 [the legislature "may . . . attempt to control the

executive branch by passing amendatory or supplemental legislation and presenting such legislation to the governor for signature or veto, or, *by the power of appropriation*" (italics added)]; *Enourato v. N. J. Building Auth.* (1982) 90 N.J. 396 [448 A.2d 449, 453] ["The Legislature has the power to fund or not to fund executive agencies and the projects undertaken by those agencies"].)

The enactment challenged in the present case is consistent with the doctrine of separation of powers, in that it was enacted by both houses of the Legislature and presented to the Governor for signature—as were the budget items in question—and the enactment expressed a legislative determination to suspend a regulation and thereby curtail the authority of the executive, in pursuit of the legitimate legislative goal of allocating scarce resources in an appropriate manner. In addition, the operation of Government Code section 17851 and the budget acts in question had only a narrow impact upon the Department of Industrial Relations' regulatory scheme and ability to enforce health and safety regulations. The districts produced no evidence of any negative consequences flowing from the Legislature's action. Indeed, it appears that the districts have purchased the protective gear at their own expense, but have not exercised their statutory authority to impose local fees to recoup this cost. (Gov. Code, § 17581, subd. (b).)

The districts complain that the practical result of a decision upholding the constitutionality of Government Code section 17581 would be to subject them to civil and criminal liability for failing to provide the protective equipment described in the regulations, even though pursuant to section 17581, the districts could not be reimbursed for the state-mandated expenditure necessary to acquire the equipment. They point out that they remain obligated to provide a safe workplace (see Lab. Code, §§ 6400-6407), and specifically to provide reasonably adequate safety devices (Lab. Code, § 6403). They assert that this duty may be enforced by departmental order, and thereafter through citations and penalties (see Lab. Code, §§ 6305, 6308, 6317) as well as injunction (Lab. Code, § 6323). They also assert that breach of this duty could subject them to liability in tort and to criminal liability. They assert that the Department of Industrial Relations could order them to provide adequate safety equipment, and yet, despite the circumstance that requirements for firefighter safety equipment have been held to be peculiarly a governmental expense and therefore subject to reimbursement as a state-mandated local program (see *Carmel I, supra,* 190 Cal.App.3d at p. 537), they would have to purchase the equipment from local funds without state reimbursement.

The State answers that the districts appropriately remain subject to general rules imposing a duty upon all employers to provide a safe workplace, and in

this way they are no more subject to civil and criminal liability than any other employer. It seems clear that by operation of Government Code section 17581 and the budget items we have noted, the districts are not subject to a duty to comply with the regulations at issue in the present case, so that no violation of *those regulations* could be posited as the basis for civil or criminal liability. In any event, it does not appear to us that the districts' complaints in this regard relate to their claim that under the separation of powers doctrine, the Legislature lacks *authority* to suspend operation of an administrative regulation. Rather, these complaints would be pertinent only to a distinct contention that is not before us: that despite the valid operation of section 17581, the Legislature did not *effectively* extinguish a state mandate to provide the particular protective equipment because that mandate flows from some source *other than the regulations identified in the budget items that are at issue in this case.*

We need not resolve the doubtful claim, however, that pursuant to some statute or regulation not identified in the budget act and therefore not suspended by section 17581, districts might remain obligated by state law to provide the safety equipment at issue in this case and that therefore they are entitled to reimbursement for state-mandated local expenditures for such safety equipment. The districts seem especially concerned that expenditures may be required of them in the future by order of the Department of Industrial Relations under other still applicable administrative orders or provisions of the Labor Code. This speculative claim is not involved in our determination that Government Code section 17581 and the related budget items do not so intrude upon the power of the executive branch as to violate our state Constitution's separation of powers clause.[6]

### IV

The judgment of the Court of Appeal is reversed, and the matter is remanded for further proceedings consistent with this opinion.

Mosk, J., Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellants' petition for a rehearing was denied May 23, 2001.

---

[6]Because of our resolution of the districts' separation of powers claim, we need not consider the districts' further claim that, in the event they are entitled to relief, the appropriate remedy would be a writ of mandate directing the Controller to pay the districts' claims from funds appropriated for operation of the Department of Finance and the Department of Industrial Relations, instead of a remand of the matter to the Commission for the processing of the districts' claims.